## DADIRRIAN v. YACUBIAN et al.

(Circuit Court, N. D. Illinois.   March 25, 1896.)

TRADE-MARK—FOREIGN NAME OF ARTICLE—MATZOON.

The word "Matzoon," having been in use in Armenia for centuries to designate an article of food made of fermented milk, cannot be appropriated as a trade-mark by the manufacturer who first introduced both the name and the article into the United States.  Nor, on the theory that the word has become in a special or secondary sense a mark of origin for complainant's goods, can defendants be enjoined from the use of the word on a label which, by a distinctive mark and accompanying printed explanations, plainly indicates the product bearing such label to be that of defendants and not that of complainant.

In Equity.   On motion.

Suit for injunction by Margar G. Dadirrian against Meshack M. Yacubian and Elia Tekirian.   Complainant moves for a preliminary injunction.

Betts, Hyde & Betts and W. B. Whitney, for complainant.

A. P. Brown and Dupee, Judah, Williard & Wolf, for defendants.

SHOWALTER, Circuit Judge.   Complainant, Dr. Dadirrian, is a physician.   He is a native of Cesaria, in Turkish Asia Minor, and since August, 1884, has been, and now is, a resident and citizen of this country.   Commencing in 1885, he has manufactured, and from July of that year has sold in New York, Chicago, and other cities a liquid or semiliquid preparation, which from the first he has called, and named on his bottles, "Matzoon," or "Dr. Dadirrian's Matzoon." He now moves for an injunction to stop defendants—natives of Armenia, but naturalized in this country—from using the name "Matzoon" in connection with a like product manufactured and sold by them in this country from a time, it would seem, prior to 1894. In Armenia and Oriental countries other than China and Japan, a familiar and common article of food or diet is, and for centuries has been, made from sterilized and fermented milk.   This product varies in consistency from a jelly to a liquid or semiliquid form;   the latter being especially appropriate, also, as a diet for the sick.   In Armenia the common, ancient, and familiar name of this product is a word which, by transliteration into English letters, becomes "Madzoon" or "Matzoon."   In connection with the sworn pleadings and a very large number of affidavits, two books of Oriental travel, written in English, and published in this country in 1868,—one in Boston and the other in New York,—were produced at the hearing.   In these books the word "Madzoon" repeatedly appears, the reference being to the article of food or diet already mentioned.   As written in Armenian characters, the name which these authors thus reproduced in English letters is not intelligible to persons unacquainted with the Armenian tongue.   The writers referred to either used a transliteration which had previously come under their notice, or spontaneously adopted what seemed to them the appropriate letters to indicate in English the name as sounded by the people who habitually spoke of the food product in question.   It is insisted by com-

plainant that "Matzoon," as used by him, is not a transliteration—at least, not the correct transliteration—of the Armenian word. The point is not very material, but I cannot hold, on the testimony here, that "Matzoon," rather than "Madzoon," is not, under the rules which comparative philologists would apply to the case, the accurate and correct transliteration.

Complainant contends, also, that the liquid or semiliquid form of the food has a distinctive name in Turkish, and is properly called "Taan," and not "Matzoon," even in Armenia. In his older circulars, Dr. Dadirrian said:

"Fermented milk, as an article of food, and as a refreshing beverage, both for invalids and persons in health, has been known and used in Oriental countries since the earliest date. The inhabitants of these countries, during the season of intense heat, both within doors and under the sun, resort to it to allay their burning thirst, instead of using beer, soda water, and the like, and obtain great refreshment therefrom. During a practice of fifteen years in Asia Minor and Constantinople, Dr. Dadirrian found Matzoon the best adapted preparation of fermented milk to supply nourishment to the sick room. Since its introduction into this country, uniform excellence and recognized efficacy of Matzoon has gained the absolute confidence and esteem of every physician," etc. "* * * As a preventive of Asiatic cholera, cholera morbus, summer complaints of infants, and all diarrheal disturbances, and as the only food in these diseases, Matzoon is used extensively in Asia and America. * * * Matzoon is a fermented milk, such as is used extensively in the Orient as a refreshing beverage, and as invalids' food. * * * This preparation of milk, as made in the Oriental countries, is materially different from, and believed to be greatly superior to, any other in use in this country."

The two English writers already spoken of, in their use of the word "Madzoon," refer to the liquid or semiliquid form of the article in question. The record contains other and conflicting testimony on the point. But, on the entire showing, I am hardly at liberty to hold that the preparation made and sold by Dr. Dadirrian is not in fact "Matzoon," as so called in Armenia, and familiarly and commonly made, used, and dealt in, in that and other Oriental countries.

Apart from the word "Matzoon," the device noted on complainant's label as his trade-mark is a pictorial representation of Mt. Ararat, with the ark and dove at the summit. Defendants, on their label, place above the word "Matzoon," conspicuously displayed in red, the capitals "Y" and "T" intertwined; being the initial letters of their names, Yacubian and Tekirian. They call their product "Y. T. Matzoon." In other respects their label is not an imitation of complainant's. Their right to use the word "Matzoon" is therefore the matter in controversy. They say on their label:

"Y. T. Matzoon is made from the best and purest sterilized milk. Matzoon has been in use in all parts of the Orient for thousands of years as a food for invalids, and persons in health, to allay thirst during fevers," etc. "Matzoon has the advantage over milk in being more easily digested, and because it does not curdle, and can be retained in the stomach when any other form of food would be rejected. Y. T. Matzoon and Matzoon used in the Orient are the same preparation, the additional initials denoting our brand."

Matzoon had been brought to this country, and had been made, used, and probably sold here, by Armenians resident here, long prior to 1884. But it had no currency or established place in trade in this country until Dr. Dadirrian commenced his manufacturing busi-

ness. To him is largely due the introduction of Matzoon as an article of trade in America. It is doubtless true that his success, and the currency given to this article with the trading public by him, was a condition carefully noted by these defendants, and determinative of their policy in entering the field as competitors with him in trade. It is possibly true, also, that his profits would be greater if defendants' business should be stopped, or if, being permitted to go on, they should be stopped from calling their product "Matzoon," and should be obliged to use the Turkish name, or to coin, and familiarize the trading public with, a name for the same other than "Matzoon." It may be law that whoever produces a manufactured article which is new may also coin a name for the same, and use that name as a trade symbol to indicate, as against persons who may choose to manufacture and sell a similar product, the origin of the article as made by himself, and that so long as such name continues to have the function of identifying his goods,—that is to say, until it shall have passed into the vocabulary of common speech as a generic name for goods of the same kind, and thus shall have in fact ceased to indicate the origin of goods made by said pioneer manufacturer,—a competitor cannot use such name as a mark of origin for his product. See section 220, Browne, Trade-Marks. Again, a manufacturer of an article of a class well known, and designated by a name in common use, may coin or select an arbitrary or fanciful word as a trade symbol to indicate the article as made by him. He may possibly select from a foreign language a word which, to the people who speak that language, indicates the same product, and be protected in his monopoly of said foreign word as a trade symbol for his own product. But I cannot hold, on the showing here, that this complainant originated either a manufactured product or a name. The article which he in July, 1885, commenced to manufacture and sell, was no less new and strange to the trading public in this country than was the name which belonged to it. If the thing called "Matzoon" had been old and familiar in the American markets with a name likewise old and familiar in the vocabulary of trade and custom in this country, it may be that complainant might have used the strange and unfamiliar combination of letters "Matzoon" as a mark for the goods made by himself. But no competitor could, even then, have been prevented from instructing or informing the public that the product made by himself, and all similar products, belonged to the class of goods used from time immemorial by Oriental peoples, and called in Armenia, or elsewhere in the Orient, "Matzoon." Under the circumstances supposed, the word might, perhaps, to a degree, have performed the function of a trade-mark, but its use in good faith as a medium of information concerning the food product in question could not have been inhibited.

When Dr. Dadirrian commenced business, in 1885, the liberty of importing or of making and selling Matzoon, and of calling it by its name, and of informing the trading public by advertisements or labels what Matzoon was, and of the long and familiar use which had been made of it in Eastern countries, belonged to any one. I know of no rule in the law of trade-marks or good will, nor does any way

of thinking about the subject occur to me, whereby that liberty could be taken away, or in any manner abridged, as the result of what has been done by Dr. Dadirrian. The semblance of right in him arises out of the circumstance that he, in effect, long monopolized the trade in Matzoon in this country, and out of the further circumstance that he, by his skill and industry, has, in effect, introduced Matzoon to the trading public here. As long as there was no competition, he had no need of a trade-mark; that is to say, the word "Matzoon" could not have had any function as distinguishing his goods from the goods of another. But, as will be seen from his circulars already quoted, he did not, in his relations with the trading public, even seek to use the word "Matzoon" as a trade-mark. It was more profitable, as well as more honest, for him to inform his patrons and the public that what he was offering them had stood the test of time and use among the peoples of the East. He therefore called the product by a name which the immemorial usage of a people familiar with the same had given it.

Neither, on the other hand, do these defendants, as will be seen from their label, use "Matzoon" as a mark of origin for their goods. This word, with them, is the generic name. The intertwined letters "Y. T." is their mark of origin. They had no more right to make and sell their product than to inform the public what Matzoon is, how long and how universally it has been used in the East, what are its specific virtues, and that they are making it and selling it in this country.

It is said that, because the word here in question would be entirely unrecognizable to the ordinary English-speaking person, if seen in Armenian characters, the transliteration "Matzoon" may be monopolized in this country as a trade symbol. I am cited to certain prior litigations instituted by Dr. Dadirrian, in which this view has apparently prevailed. A word is a combination of articulate sounds by which men communicate with each other. To say that the Armenian characters whereby the sound "Matzoon" is indicated are unknown to a person who does not know them is a proposition which carries with it no information. The impulses by which a word extends itself from the usage of one people to that of another, the laws of comparative philology by which a transliteration—when the elemental sounds of one language are signified by written signs unknown in the other—is explained and held to be accurate, and the arrangement of English letters which reproduce the word, are subject to the exclusive dominion of no man. In the vocabulary of a person unacquainted with the letters or characters in which any language is written, but who knows the article here in question, made from sterilized and fermented milk, as "Matzoon," that word has a place. By such person such word will be spontaneously used as a means of communication. A word must exist in speech before it can be signified in letters or characters. I am not able to see how the legal aspects of the case would be different if the name "Matzoon" were written in the same characters in Armenian as in English. A declaration by these defendants, whether written or spoken, that the article made and offered for sale by them is Matzoon, is

true, equally with the like written or spoken declaration by complainant as to the article made and offered for sale by him.    Let it be assumed that these defendants are taking advantage of a popularity and knowledge of "Matzoon" on the part of the trading public which Dr. Dadirrian has been the chief instrument in bringing about; how, in view of their labels, and of the facts shown on this hearing, can it be fairly declared that they are trying to pass off or sell their product as having been manufactured by him?    The strong contention is that Dr. Dadirrian introduced into this country a product which was unknown here, and by a name which was equally unknown, and that, since the name has become identified here with the article as made by him, his property in the name should be recognized.    But, as already said, the product was in fact old, as was also the name.    The ignorance of people in this country touching it, its uses and its name, cannot be treated as property, and be, in a manner, capitalized as an element in the good will of this complainant.    This would be the case if no other dealer were permitted to tell what Matzoon is, and what a considerable portion of the human race has found it useful for, after an experience with it under that name which, according to the record, dates back some eight centuries.

In the English case, Davis v. Stribolt, 59 Law T. (N. S.) 854, both plaintiff and defendant were importing from Norway, and selling in England, a kind of beer made in Norway, and there known as "Boköl."    Both the article and the name were new in England, and, because the name "Boköl" was unknown in that country, it was urged in that case, as in this, that plaintiff could make it the subject of exclusive appropriation as a trade symbol.    But the court (Chitty, J.) said:

"If the argument were well founded, the importer into this country of any foreign article not previously known in this country could restrain any one else from using the name by which it was called in the country in which it was produced."

And also:

"The complainant's position amounts to this: that, although they cannot stop the sale of the article here, they can prevent anybody else from selling the article under its only appropriate name."

In Canal Co. v. Clark, 13 Wall. 311, complainant had for more than 20 years been the sole producer of coal from a certain region in Pennsylvania.    This coal complainant marketed under the name "Lackawanna Coal," and by that name complainant's product was known to the trade.    In course of time other and cheaper coals from the same region became known as "Pittson" and "Scranton" coals.    The defendant was advertising and selling these latter coals as Lackawanna coals, and complainant sought to have him enjoined. It appeared that all coals from that region had come to be classed in statistics, and not infrequently spoken of in the trade, as "Lackawanna Coal."    The injunction was denied.    The supreme court of the United States said:

"The office of a trade-mark is to point out distinctively the origin or ownership of the article to which it is affixed, or, in other words, to give notice who

was the producer. * * * Where rights to the exclusive use of a trademark are invaded, it is invariably held that the essence of the wrong consists in the sale of the goods of one manufacturer or vendor as those of another, and that it is only when this false representation is directly or indirectly made that the party who appeals to a court of equity can have relief. * * * No one can claim protection for the exclusive use of a trade-mark or trade-name which would practically give him a monopoly in the sale of any goods other than those produced or made by himself. * * * It is only when the adoption or imitation of what is claimed to be a trade-mark amounts to a false representation, express or implied, designed or incidental, that there is any title to relief against it. True, it may be that the use by a second producer, in describing truthfully his product, of a name or a combination of words already in use by another, may have the effect of causing the public to mistake as to the origin or ownership of the product; but if it is just as true in its application to his goods as it is to those of another who first applied it, and who therefore claims an exclusive right to use it, there is no legal or moral wrong done. Purchasers may be mistaken, but they are not deceived by false representations, and equity will not enjoin against telling the truth. We are therefore of opinion that the defendant has invaded no right to which the plaintiffs can maintain a claim. By advertising and selling coal brought from the Lackawanna Valley as 'Lackawanna Coal,' he has made no false representation, and we see no evidence that he has attempted to sell his coal as and for the coal of the plaintiffs. If the public are led into mistake, it is by the truth, not by any false pretense. If the complainants' sales are diminished, it is because they are not the only producers of Lackawanna coal, and not because of any fraud of the defendant."

In the same opinion the following is quoted with approval:

"The owner of an original trade-mark has an undoubted right to be protected in the exclusive use of all the marks, forms, or symbols that were appropriated as designating the true origin or ownership of the article or fabric to which they are affixed; but he has no right to the exclusive use of any words, letters, figures, or symbols which have no relation to the origin or ownership of the goods, but are only meant to indicate their names or quality. He has no right to appropriate a sign or a symbol which, from the nature of the fact it is used to signify, others may employ with equal truth, and therefore have an equal right to employ for the same purpose."

The last sentence is again quoted in Corbin v. Gould, 133 U. S. 314, 10 Sup. Ct. 312.

I understand that the showing made here differs somewhat from that made in the prior litigations wherein Dr. Dadirrian's contention has been sustained. I understand, also, that, on substantially the same state of facts as shown here, the circuit court of the United States for the district of Massachusetts denied the application of Dr. Dadirrian for an injunction. The circumstance that these defendants might have used, instead of the name "Matzoon," the Turkish name,—for complainant insists that there is a Turkish name for the product,—can hardly be construed as indicating unfair competition. These defendants are themselves Armenians, and the capital fact insisted on by them is that, whatever may be the name in Turkish or Arabic, it is "Matzoon" in Armenian. Moreover, the article is now, to some extent, known in this country, and, so far as known, it is Matzoon. That Dr. Dadirrian was instrumental in imparting this knowledge is not material. It would seem to be not only truthful and appropriate, but due to that portion of the trading public which has been made acquainted with the article as "Matzoon," that another manufacturer of the same thing should call it by that name. Browne, Trade-Marks, § 220. By the inter-

twined letters and the printed matter on their label these defendants clearly distinguish their product from that of complainant. If it can be said that Matzoon, being a name or descriptive word, has acquired a secondary sense as indicating the manufacture of complainant, still the label of these defendants is not a false representation—for such secondary sense is plainly excluded in their use of the word. On the present showing the application for the injunction is denied.