## LE BLUME IMPORT CO., Inc., v. COTY et al.

## COTY, Inc., v. LE BLUME IMPORT CO., Inc.

(Circuit Court of Appeals, Second Circuit. June 18, 1923.)

Nos. 288, 289.

1. **Trade-marks and trade-names and unfair competition ⬤�top81—Identity of mark or name not essential to injunctive relief.**

To entitle the owner of a trade-mark or trade-name to an injunction, it is not essential that the mark or name used be the same, if it be so similar that purchasers would be liable to be misled.

2. **Trade-marks and trade-names and unfair competition ⬤�top1—Monopoly is as complete as that of patent.**

The monopoly given to a valid trade-mark under the laws of the United States is as complete, so far as it goes, as the monopoly created by a patent.

3. **Trade-marks and trade-names and unfair competition ⬤�top53—Essence of invasion of right is sale of goods of one as those of another.**

In all cases where rights to the exclusive use of a trade-mark are invaded, the essence of the wrong consists in the sale of the goods of one manufacturer or vendor as those of another.

4. **Trade-marks and trade-names and unfair competition ⬤�top21—Prior use in foreign country does not defeat right to protection in United States.**

It is not essential that one who claims protection for his trade-mark should in all cases be able to show that he first used it, and his right to protection in the United States is not defeated by showing a prior use of a like trade-mark in a foreign country, if he was the first to use it in this country.

⬤⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Trade-marks and trade-names and unfair competition ⟲⟹31—Exclusive right to trade-mark limited to market where used.**

One who has acquired a technical trade-mark, and used it in a limited territory, does not thereby acquire a prior right to its use in an entirely different territory.

**6. Trade-marks and trade-names and unfair competition ⟲⟹31—Casual sale in territory does not establish a "market" there.**

A casual sale or a casual importation does not establish or create a "market," within the rule that a trader may protect his trade-mark or trade-name in the market in which he sells, and prevent another trader from adopting the same trade-mark or trade-name in that territory.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Market.]

**7. Trade-marks and trade-names and unfair competition ⟲⟹3(5)—That word is suggestive of ingredients or quality does not bar its use as trade-mark.**

While it is the general rule that a word which is merely descriptive of the article on which it is used, or of its ingredients or characteristics, cannot be a valid trade-mark. The rule does not necessarily exclude words which are suggestive of ingredients or quality.

**8. Trade-marks and trade-names and unfair competition ⟲⟹3(4)—Descriptive word may acquire secondary meaning, which makes it valid trade-mark.**

Though a word in its primary meaning is descriptive, if it has been used so long or so exclusively in a particular market by a particular dealer that it has come to mean in that market that the article on which it is used is his product, it acquires a secondary meaning, which entitles him to assert an exclusive right to its use in that market.

**9. Trade-marks and trade-names and unfair competition ⟲⟹3(1)—"Lorigan" held valid trade-mark for perfume.**

The word "Lorigan," registered by Coty as a trade-mark for a perfume, *held* valid, and to protect the perfume imported and sold by Coty under the name "L'Origan de Coty," which is a bouquet or fluid perfume, not having the odor of any particular flower or plant, and which name has become identified, in the trade and by the perfume-buying public of the United States, with that particular Coty perfume.

**10. Trade-marks and trade-names and unfair competition ⟲⟹3(1)—Word which is obsolete or unknown to general public may be valid trade-mark.**

A word which has become obsolete, or which is not in general or common use, and is unintelligible and nondescriptive to the general public, though it may be known to linguists and scientists, may be regarded as arbitrary and fanciful, and capable of being used as a trade-mark or trade-name.

**11. Trade-marks and trade-names and unfair competition ⟲⟹22—Trade-mark held not invalid for fraud.**

That a perfume sold under the name "L'Origan" as a trade-mark contains no oil of origanum, but is a bouquet or fluid perfume, not imitating the odor of any particular flower, *held* not to render the trade-mark invalid for fraud, under evidence that such oil is not used as a perfume. Nor does such fact relieve a competitor from infringement by the use of the word "origan" because he uses a negligible quantity of oil of origanum in his product.

Manton, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the Southern District of New York.

Suits in equity by Le Blume Import Company, Inc., against Joseph Francois de Spoturno Coty and others, and by Coty, Inc., against Le

Blume Import Company, Inc. From the decrees, Le Blume Import Company, Inc., appeals. Affirmed.

For opinion below, see 292 Fed. 264.

*First Suit.*—The plaintiff in this suit is a corporation organized under the laws of the state of New York, and having its principal place of business in the borough of Manhattan, in the city of New York. It also maintains a buying office in Paris, France. It is engaged in the business of importing into the United States from Paris, France, toilet articles, including perfumes and cosmetics, for the resale thereof at wholesale. The defendant Coty is a citizen of the republic of France and a resident of Paris. The defendant Levy is a citizen of the United States, doing business in the borough of Manhattan, and resides in the Southern district of New York. He is the commercial representative in this country of the defendant Coty. The defendant Stuart is the acting collector of the port of New York.

In November, 1922, the plaintiff, it is alleged, purchased in Europe a quantity of perfume designated as "Origan," and further designated by the name of the manufacturer thereof d'Heraud, for whom it is the exclusive agent in the United States. The plaintiff thereupon caused the perfumes so purchased and owned by it to be transported to the United States. Thereupon it is alleged that the defendants Coty and Levy caused to be filed in the office of the collector of the port of New York notice that the said defendants and their licensees are entitled to the sole and exclusive right to sell in the United States the perfume designated as "Origan" perfume, and the notice purported to be given under section 27 of the Trade-Mark Act of the United States. Act Feb. 20, 1905 (Comp. St. § 9513), as amended. It is also alleged that pursuant to this notice the defendant Stuart, as acting collector of the port, has caused the said perfume to be unlawfully excluded from entry into the United States, although plaintiff is ready and willing at all times to pay, and has actually paid, the import duties on the goods. It is also alleged that the trade-mark "L'Origan," registered by Coty, does not give to Coty, his agents and representatives, the sole and exclusive right to import into and sell in the United States perfumes designated "Origan," and does not prevent the importation into and sale in this country by others than Coty of perfumes so designated. It is also alleged that the plaintiff is irreparably damaged by the acts complained of, and it prays the court that the defendant Stuart, acting collector of the port, "be ordered or instructed or advised by a proper order or decree of this court to admit to entry to the United States and to release and deliver to the plaintiff forthwith his lawful property, the said perfume, upon the payment to the Treasury Department of the United States the lawful custom duties on and applying to the same and such other dues or charges that may be lawfully taxable thereto; that the defendants Coty and Levy be enjoined from claiming any exclusive right to the use of the word 'Origan,' or the words 'L'Origan,' or from representing to the trade and the public that they or either of them, or any licensee under them, have the exclusive right thereto under the Trade-Mark Act or otherwise; that preliminary and perpetual injunctions or orders of this court issue in accordance with the prayers hereof; and for such other and further relief as may be meet and conformable to equity and good conscience."

After the filing of the complaint in the first suit, the plaintiff moved to compel the defendant Coty to withdraw his notice to the collector of the port of New York to withhold entry of the goods bottled under the name of "Origan" and to compel the collector to release them. The motion was denied, as was one made by the defendant to dismiss the complaint.

*Second Suit.*—The plaintiff in this suit is a corporation organized under the laws of the state of Delaware, and is the successor to the entire business in the United States of Francois Joseph de Sporturno Coty in perfumes, toilet preparations, and cosmetics. The plaintiff alleges that it exclusively owns the said business in the United States, the good will, and the trade-marks and registrations thereof in the United States Patent Office. It alleges that the defendant has attempted to infringe upon a registered trade-mark owned by the plaintiff, namely, the trade-mark "L'Origan" for perfumes, as set forth in

certificate of registration 146,974 in the United States Patent Office, by attempting to import perfumes from France into the United States designated as "Origan," being bottled perfumes marked "d'Heraud Bottle," with the intent of selling them in interstate and intrastate commerce throughout the United States. That the intent of defendant in doing this is to defraud the trade and the public into purchasing the goods of d'Heraud under the belief that they are purchasing the genuine or original "L'Origan" brand. The prayer of the bill is that the defendant be restrained from importing or attempting to import, or sell or attempting to sell, any perfume or toilet preparation with the use of the trade-mark "L'Origan" or "Origan," or any other deceptive simulation thereof, and that such other and further relief be granted as may be deemed proper.

The defendant filed an answer, in which it denied that the word "L'Origan" ever has been or ever can be a trade-mark for the designation of perfumes or other toilet preparations, or that Coty was entitled to have the word registered under the acts of Congress. It denied that either the word "Origan" or "L'Origan" were ever registered or attempted to be registered in the Patent Office of the United States, and it alleged that in lieu thereof "a fanciful word 'Lorigan,' printed in intermingled letters of a grotesque design," was registered; and the answer further alleged that Coty has falsely represented that he has become by exclusive appropriation and by registration in the Patent Office, the sole owner and exclusively entitled to the use of the word "L'Origan" or "Origan" as a trade-mark for the designation of a perfume produced by him. The answer prayed that the motion for a temporary injunction be denied and that the bill be dismissed.

The court granted the motion for an injunction, as asked by the plaintiff, upon the filing of a bond in the sum of $10,000, and it enjoined the defendant, and all under it or in privity therewith "until further order of this court, from making or causing to be made, or selling or causing to be sold, or offering for sale or causing to be offered for sale, or importing or causing to be imported, any perfumes, powders, or other toilet preparations with the use of or in connection with the trade-mark 'L'Origan,' or any deceptive simulation thereof, including 'Origan,' and from infringing upon the said trade-mark and the exclusive rights of the plaintiff thereto in any manner whatsoever."

Davies, Auerbach & Cornell, of New York City (Charles H. Tuttle, Murray C. Bernays, and Emily C. Holt, all of New York City, of counsel), for Le Blume Import Co., Inc.

Charles Neave, Hugo Mock, and Asher Blum, all of New York City, for Coty, Inc., and others.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The question raised by these cases makes it necessary to determine whether the Coty trade-mark was capable of registration in the Patent Office of the United States. If it was not entitled to registration, the plaintiff in the first of these two suits was entitled to the relief it sought. On the other hand, if the trade-mark was entitled to registration, the plaintiff in the second suit was entitled to the injunction which it obtained, and error was not committed in either suit.

In both suits counsel moved for temporary injunctions. In the first suit no answer was filed. In the second an answer was put in. In both suits a large number of affidavits were submitted to the court, and on account of the related character of the two actions, and of the fact that the issues in each of them are substantially similar to the issues in the other, it was stipulated that the exhibits and affidavits in each of the cases should be considered in evidence and be part of the record

in the other. The parties in both suits have been represented by able counsel, who have argued fully the question involved.

It appears that Francois Joseph de Spoturno Coty, of France, on October 27, 1920, filed an application in the United States Patent Office to register the trade-mark "L'Origan" for certain toilet preparations or perfumes; that on September 27, 1921, registration of the trade-mark was granted to him, and certificate No. 146,974 was issued to him, which is still in force; and that the trade-mark was thereafter duly assigned to Coty, Inc., the plaintiff in the second of the suits now before the court, and that that corporation has owned the entire right, title, and interest in the trade-mark, the registration therefor, and all the business connected therewith since January 1, 1923.

In one of the affidavits in the record Coty is described as "one of the most celebrated perfumers in the world," and it is stated that his "reputation is of the highest, both in France and in the United States." It appears that in 1909 Coty began to export to the United States his toilet preparations, and that he then adopted the trade-mark "L'Origan" to designate his perfumes and toilet preparations, and to identify them to the trade and to the public as being the said Coty's manufacture and the manufacture of no other person or concern; and it is claimed that since 1909 the trade-mark "L'Origan" in the United States has designated the preparations before mentioned as being manufactured by Coty and by no other person. In the year 1919 the sales in the United States of Coty's "L'Origan" amounted to more than $500,000. In 1920 they exceeded $1,000,000, and in 1921 they amounted to more than $2,000,000; while in 1922 they had increased to over $3,000,000, and it is said that this trade-mark is the most valuable in this particular field in the United States.

In the bill of complaint which Coty, Inc., filed, it is stated that the trade-mark which Coty adopted and registered is "L'Origan." A fac simile copy of the trade-mark does not appear in the record. But from the affidavit of the collector of the port it appears that a fac simile copy of the trade-mark was filed with the Secretary of the Treasury and that the name registered is "Lorigan," and the bill seeks to restrain the importation of a perfume called "Origan" as an infringement of the Coty trade-mark; so that the registered trade-mark is "Lorigan," the word actually used by Coty on his perfumes is "L'Origan," and the word used on the perfumes alleged to infringe is "Origan." The question propounded by counsel for the alleged infringer is whether the owner of the registered trade-mark, in registering the fanciful word "Lorigan" and then never using it, can restrain the use of the word "Origan." But the English words "Lorigan" and "Origan" and the French words "L'Origan" mean the same thing.

In his registration of his trade-mark in this country, Coty has simply used the English rather than the French form of the word. Counsel for Le Blume Company say in their brief that "to the exclusive use of that artificial word ('Lorigan') and design Coty is no doubt entitled." They contend, however, that, having registered his trade-mark as "Lorigan," he is not justified in the use of the words "L'Origan" on his goods, and that in any event the infringement is not made out by

the use of another word "Origan." We think that this distinction between "Lorigan" and "L'Origan" or "Origan" is too refined to be of controlling importance in the law of trade-marks. See Dadirrian v. Yacubian, 98 Fed. 872, 874, 39 C. C. A. 321.

[1] But whether these words be regarded as one and the same, or different, it is evident that they fall within the idem sonans rule. The rule is that, if words or names may be sounded alike without doing violence to the power of letters found in the various orthography, the variance is immaterial. It is not essential to the right of a complainant to an injunction in cases of this character that the word or name used be the same, if it be so similar that purchasers would be liable to be misled. In National Biscuit Co. v. Baker (C. C.) 95 Fed. 135, Judge Lacombe held "Uneeda" a proper trade-mark and infringed by the use of "Iwanta." In Regis v. Jaynes & Co., 185 Mass. 458, 70 N. E. 480, the plaintiff, who used the word "Rex" as a trade-mark, was held entitled to restrain the defendant from using the word "Rexall" in connection with similar articles. In Steinway & Sons v. Henshaw, 5 R. P. C. 77, the makers of the "Steinway Pianos" were held entitled to restrain a competitor from using the name "Steinberg Pianos," because of the general resemblance of the names. In Estes v. Leslie (C. C.) 27 Fed. 22, the publisher of the "Chatterbox" was allowed to restrain the publication of "Frank Leslie's Chatterbox." In N. K. Fairbank Co. v. Luckel, King & Cake Soap Co., 102 Fed. 327, 42 C. C. A. 376, the Circuit Court of Appeals in the Ninth Circuit granted an injunction because "Gold Dust" and "Gold Drop" were so similar that the public was likely to be misled. And in Stephens v. Peel, 16 L. T. N. S. 145, a competitor of "Stephens Blue Black Ink" put on the market "Steelpens Blue Black" ink, and was restrained on the ground that he infringed. If in the cases referred to the similarity in the names warranted the relief granted, it cannot be doubted that such a similarity exists between the words "Lorigan," "L'Origan," and "Origan" as to justify an injunction restraining the use of "Origan" as infringing either of the other two.

[2] We have assumed, in what has been said, that the words used are in themselves unobjectionable. Whether the words are in law objectionable must be considered. But before entering upon that inquiry we may point out that the monopoly given to a valid trade-mark under the laws of the United States is as complete, so far as it goes, as the monopoly created by a patent. This was so stated recently by the Supreme Court of the United States in Bourjois v. Katzel, 43 Sup. Ct. 244, 67 L. Ed. 464, decided on January 29, 1923, and not yet [officially] reported. As the court in that case said, a trade-mark "deals with a delicate matter, that may be of great value, but that easily is destroyed, and therefore should be protected with corresponding care." In this case we are asked to protect a trade-mark which has been registered under the trade-mark laws of the United States. If it be valid, it evidently is a trade-mark of great value, and is entitled to whatever protection the courts can grant. We have given the questions presented the careful consideration to which they are entitled, and will proceed to state the reasons which have led us to the conclusion that

the Coty trade-mark is valid, and is entitled to be protected by injunction.

[3] We may also point out that it is a well-established and fundamental principle of law that no person has a right to pass off his goods as though they were the goods of another. This is the foundation principle upon which relief is granted in such cases. As was well said in Canal Co. v. Clark, 13 Wall. 311, 322 (20 L. Ed. 581):

"In all cases where rights to the exclusive use of a trade-mark are invaded, it is invariably held that the essence of the wrong consists in the sale of the goods of one manufacturer or vendor as those of another."

If that is being attempted, an injunction should issue, but otherwise not.

[4, 5] The record discloses that for over 100 years a perfume called "Origan" has been manufactured or produced in Paris by the house of Renan, which still exists and is engaged in carrying on the business; and it also appears that many perfumers in Paris are at this time manufacturing a perfume called "Origan," but it is not disclosed, except in the case of Renan, when they commenced the manufacture of "Origan," whether before or after Coty put his perfume on the market. And in France these manufacturers of perfume invariably put their name after the name of the perfume, as "Origan-LaFleur." But the right of Coty to protect his trade-mark "Lorigan" or his right to use "L'Origan" upon his perfumes in the United States is not dependent upon whether he has any exclusive right to the trade-mark or to the trade-name in France. It cannot be denied that the protection of a trade-mark in the United States is not to be defeated by showing a prior use of a like trade-mark in France, or in some other foreign country. It is not essential that one who claims protection of his trade-mark should in all cases be able to show that he first used it. The prior use of a mark by another in some foreign country is not fatal, if the one claiming protection is able to show that he was first to use it in this country. Gorham Mfg. Co. v. Weintraub (D. C.) 196 Fed. 957; Walter Baker & Co. v. Delapenha (C. C.) 160 Fed. 746; Richter v. Reynolds, 59 Fed. 577, 579, 8 C. C. A. 220; Richter v. Anchor Remedy Co. (C. C.) 52 Fed. 455, 458. It may be true that a trader can protect his trade-mark in all the markets in which he sells without respect to territorial limits, but it is not true that one who has acquired a technical trade-mark and used it in a limited territory thereby acquires a prior right to its use in an entirely different territory. Thus in Hanover Milling Co. v. Metcalf, 240 U. S. 403, 415, 36 Sup. Ct. 357, 361 (60 L. Ed. 713) the Supreme Court said:

"In the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the question. But where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, the question of prior appropriation is legally insignificant, unless at least it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like."

And this doctrine was adhered to in United Drug Co. v. Rectanus Co., 248 U. S. 90, 39 Sup. Ct. 48, 63 L. Ed. 141. This is not a suit

by a French manufacturer, who claims that because of previous sales under his French trade-mark, which he had made in the United States, he had acquired rights which made it unlawful for Coty to register here the same trade-mark. It may be quite true that prior to Coty's registration of his trade-mark in the United States there may have been some casual importations to a limited extent of perfumes from abroad, but these occasional importations were so infrequent and inconsequential that it cannot be said that the producer of the goods had obtained a market for them here which entitled his trade-mark to protection.

[6] A casual sale or a casual importation does not establish or create a market, within the rule that a trader can protect his trade-mark or trade-name in the markets in which he sells, and prevent another trader from adopting the same trade-mark or trade-name in that territory. Menendez v. Holt, 128 U. S. 514, 521, 9 Sup. Ct. 143, 32 L. Ed. 526; Richter v. Anchor Remedy Co. (C. C.) 52 Fed. 455, 456; Kohler v. Beeshore, 59 Fed. 572, 576, 8 C. C. A. 215. In Eiseman v. Schiffer (C. C.) 157 Fed. 473, the court sustained the validity of "radium" as a trade-mark for silk goods, although it appeared that the word first came into use in Paris in connection with peculiarly lustrous fabrics, and was then taken up by many persons in this country for use in the same connection. That circumstance, the court declared, was immaterial, because the evidence showed that the party registering the word here was the first to use it in this country. See J. & P. Baltz Brewing Co. v. Kaiserbrauerei, Beck & Co., 74 Fed. 222, 20 C. C. A. 402; Gorham v. Weintraub (C. C.) 176 Fed. 927. And we have no doubt upon the evidence in this record that Coty was the first in the markets of the United States to use the words "L'Origan" in connection with perfumes, with the possible exception of a few importations which were so casual that they may be ignored.

[7] The Trade-Mark Act of February 20, 1905 (section 5), denies registration to a mark which consists merely in words or devices which are descriptive of the goods with which they are used, or of the character or quality of such goods. It was claimed at the argument that Coty's trade-mark is descriptive, within the meaning of section 5, and so was incapable of registration. The general rule is unquestionable that a word which is descriptive of the article upon which it is used, of its ingredients, quantities, or characteristics, cannot be a valid trade-mark. Standard Paint Co. v. Trinidad Asphalt Manufacturing Co., 220 U. S. 446, 31 Sup. Ct. 456, 55 L. Ed. 536. The rule, however, is not without qualification. The cases show that the courts under certain circumstances protect the use of words as trade-marks, even though they suggest the ingredients, qualities, or characteristics of the goods. The distinction is between words which are "descriptive" and those which are merely "suggestive." Neither is it necessary that words to be available as trade-marks should carry no suggestion of any meaning. The line of demarcation may not be easy to draw but it exists. See Nims on Unfair Competition and Trade-Marks (2d Ed.) §§ 200–202.

In Keasbey v. Brooklyn Chemical Works, 142 N. Y. 467, 37 N. E. 476, 40 Am. St. Rep. 623, the court held that "Bromo-Caffeine" was

a valid trade-mark in an opinion by Judge Peckham, later a Justice of the Supreme Court of the United States. It was claimed that the name was clearly descriptive, indicating the essential ingredients of the article produced, and therefore could not be the subject of a trade-mark. But Judge Peckham said that:

"All that any one could do on reading these words would be to guess that probably the article contained some caffeine and some bromine, free or combined with some bromide, or else with some other organic compound which bromine will combine with, and as to which of these almost infinite possibilities was the fact the word 'Bromo' would convey no information whatever."

In Coca-Cola Co. v. Koke Co., 254 U. S. 143, 41 Sup. Ct. 113, 65 L. Ed. 189, the court had before it the validity of the trade-mark "Coca-Cola." The District Court had sustained the validity of the trade-mark. 235 Fed. 408. But the Circuit Court of Appeals had reversed the judgment. 255 Fed. 894. This it did because at first the compound consisted in large part of cocaine, and the other main ingredient, caffeine was derived mainly and almost exclusively, not from cola nuts, but from tea leaves, while the labels attached to the preparation contained pictures of coca leaves and cola nuts. Later, and a considerable time before suit was brought, the cocaine was eliminated, and the caffeine, of which the product was mainly, if not entirely composed, continued to be derived from other sources than the cola nut. The reversal was based upon the fact that this conduct was so deceptive, false, fraudulent, and unconscionable as precluded a court of equity from affording any relief. The Supreme Court, however, reversed the Circuit Court of Appeals, and affirmed, with a modification, the decree of the District Court. The only question in the Supreme Court was whether there had been such fraudulent representations to the public that the plaintiff had lost its right to the protection of the trade-mark. Mr. Justice Holmes in his opinion said:

"Of course a man is not to be protected in the use of a device the very purpose and effect of which is to swindle the public. But the defects of a plaintiff do not offer a very broad ground for allowing another to swindle him. The defense relied on here should be scrutinized with a critical eye."

And it was declared:

"The plaintiff's position must be judged by the facts as they were when the suit was begun, not by the facts of a different condition and an earlier time."

The argument as to fraud did not satisfy the court. "The name," said the opinion, "now characterizes a beverage to be had at almost any soda fountain. It means a single thing coming from a single source, and well known to the community. It hardly would be too much to say that the drink characterizes the name as much as the name the drink. In other words Coca-Cola probably means to most persons the plaintiff's familiar product to be had everywhere rather than a compound of particular substances." So that, if the word "L'Origan" used in the United States has come to mean a single scent, coming from a single source and well known to the community, and the scent characterizes the name as much as the name the scent, it is entitled to protection.

[8] For it is entirely clear that, if a word which in its primary sense is descriptive has nevertheless been used so long or so exclusively in a particular market by a particular dealer that his product in that market and to its purchasing public has come to mean that the article in connection with which the word is used is the product of a particular producer, it acquires a secondary meaning, which is indicative of the manufacturer and the excellence of the thing produced, and enables the manufacturer to assert an exclusive right in the word. Nims on Unfair Competition and Trade-Marks (2d Ed.) § 37. So that a word, although in its primary meaning descriptive and so incapable of registration, may by long use in connection with the goods or business of a particular trader acquire a secondary meaning, and come to be understood as designating the goods or business of the particular trader, and to entitle him to protection by injunction. Wotherspoon v. Currie, L. R. 5 H. L. 508. And in such cases the only material question is whether the word in the trade means that the goods to which the word is attached are the goods of a particular manufacturer. Cohen v. Nagle, 190 Mass. 4, 18, 76 N. E. 276, 2 L. R. A. (N. S.) 964, 5 Ann. Cas. 553.

[9] We think it is not too much to say upon this record, to which we shall later in this opinion more fully refer, that the words "L'Origan" in the United States mean, to most persons of the perfume-buying public, Coty's particular product, and not the fragrance of a particular plant or flower, or the ingredients which are used in its manufacture and which the evidence does not disclose. The word "origan" is an English word, and one of great antiquity. The New Standard Dictionary defines it as "wild marjoram" and states that it is "rare." And the Century Dictionary defines it as "a plant of the genus Origanum; marjoram; wild marjoram; also pennyroyal." And "origanum" is defined in the same work as "a genus of labiate plants of the tribe Satureineæ and the subtribe Menthoideæ." It is added, "There are about 30 species, mainly of the Mediterranean region." While the word "origan" has retained its currency among pharmacists and botanists, its use for many years seems to have been almost exclusively confined to them, and it has been only occasionally used in modern English literature. It is in no sense a word of common speech in English.

When in 1909 Coty's perfume "L'Origan" began to be imported from France into the United States, the words "L'Origan" signified, as the court below properly found, nothing to the public in this country except the article itself. There is no evidence in the record that before 1909 any one here had ever used the word upon any toilet perfume whatever, except the statement in an affidavit made by d'Heraud, an interested party in this litigation, that "Oriza," a "perfumer of Paris, shipped a perfume 'Origan' to the United States during the year 1901." It does not appear that there was more than one shipment, or that the shipment contained more than one bottle of the perfume. The record contains one other affidavit as to the importations into the United States of "Origan" perfume. It does not, however, profess to deal with the situation as it existed in 1909 or prior thereto; the affiant expressly stating that his knowledge did not go back that far, but ex-

tended to 1920, when Coty applied for the registration of his trademark. His statement is as follows:

"I deny of my own said personal knowledge that after that time [1920] the use of that designation for perfume was exclusive, either in the United States of America or in France, to Coty, but state, on the contrary, of my own said personal knowledge, that at the time and prior to that time perfumes having the Origan fragrance, and designated either as 'Origan' or 'L'Origan,' manufactured by persons other than Coty, have been generally, freely, and commonly sold in France and in the United States of America at wholesale and at retail."

This statement does not satisfy or convince us. If the statement is in accordance with the facts, the trade directories issued in 1920 and thereafter should afford some evidence substantiating it; but they do not seem to do so, as will appear more fully as we proceed. The record, we think, makes it clear that in the United States the name "L'Origan" designates a certain perfume manufactured by Coty. To some of this testimony we shall refer. A witness of long experience in the trade in perfumes in France and in the United States says:

"The only connection between 'L'Origan' or 'Origan' and the perfume trade is entirely fanciful and due to Coty, who gave this name to a popular and well-known brand of perfume, which is largely sold in the United States, and who, as far as I know, has been the only one to sell a perfume under this name in the United States."

The director of certain laboratories manufacturing toilet preparations in the city of New York, and who had 25 years' experience in the perfume business, says:

"I know Coty as one of the well-known makers of high-class French perfume; and have known the perfume 'L'Origan,' which is produced by Coty, for many years. Although I have spent 25 years in pharmaceutical and perfume and allied lines, it never occurred to me that the name 'L'Origan' was anything except the name of a particular perfume made by Coty, as I have never associated the word 'Origan' or 'L'Origan' with any particular floral odor. I have always looked upon it as an invented name."

The manager of a company exclusively engaged in importing French perfumes into the United States, and who had been connected with it for 18 years, and was not in any way connected with Coty, and who said that Coty was an active competitor with his company, stated:

"I have never heard of any other Origan or L'Origan in the United States, except Coty's L'Origan. In my position I have come in contact with hundreds of retail stores, and I have never seen in any part of the United States any other perfume on display bearing the name 'L'Origan' except Coty's product. I have never seen any perfume in the United States on display labeled simply 'Origan' without the 'L.'"

The perfumery buyer of one of the largest department stores in Brooklyn, who had been connected with the perfumery business for 30 years, says:

"During my entire experience with this business I have never heard of 'L'Origan' or 'Origan' being used in any connection whatever, save to designate a certain brand of Coty's perfume, and this is the only meaning that 'L'Origan' or 'Origan' has to me and to the customers who buy perfumes. * * * When customers come into our establishment and ask for 'L'Origan' perfume,

or 'Origan,' I know that they expect to receive this brand of Coty's perfume and nothing else. and I would decline to handle any perfume which was marked 'L'Origan,' unless it was the genuine Coty perfume."

The president of the company which publishes "Toilet Requisities," a monthly periodical devoted to the perfumery and toilet goods trade, and also "Tr Register," which is intended to be a complete directory of the various brands of perfumes, toilet waters, face powders, etc., sold in the United States, submitted to the court a copy of the 1922–23 "Tr Register," which is supposed to list all brands and trade-names of perfumes in demand among the buyers of toilet goods in the United States. He states that the data published in "Tr Register" are obtained by careful inquiry throughout the trade and are made as complete as possible every year. There is no other "L'Origan" listed in that directory, except Coty's nor does the word "Origan," as the brand, trade-name, or description of a perfume, appear anywhere in the work. He states that the reason for this is because, from the complete records of his company, "it does not appear that at any time in the past in the United States any perfume has been sold with the name 'L'Origan,' except Coty's 'L'Origan.'" He stated, however, that in the January number of "Toilet Requisites" (1922–23 we infer) there appeared an advertisement of the Le Blume Import Company featuring the word "Origan," but he added:

"As far as I am aware, this product has not been on sale in the United States prior to the appearance of this advertisement."

And one who had been in the perfume business for 40 years, and was at the time connected with a well-known house engaged in the business of importing perfumes, states:

"I am acquainted with Coty's 'L'Origan' perfume, and I consider this to be a blend or bouquet perfume, and as far as I know it is not based upon the odor of any particular flower, and I believe that the only meaning that 'L'Origan' or 'Origan' has to the general public, and indeed to the trade, is merely a name which designates one of Coty's perfumes."

One not a dealer, but a purchaser for her own use of French perfumes, both in France and in this country, and not interested in this litigation, and who did not know any of the parties, after stating her knowledge of French perfumes and her personal use of them, declares:

"I know Coty's 'L'Origan' as one of the most popular of the French perfumes, and have always thought of 'L'Origan' as simply the name of a perfume of Coty, without associating it with the name of any particular flower or floral odor. * * * I would naturally feel that, if any druggist offered me an 'Origan' perfume, a product of Coty's was intended."

Another individual, not a dealer, states:

"For many years I have known of the 'L'Origan' brand of perfume, and this has never meant anything to me except a certain brand of the perfume of one perfumer, namely, Coty. I have purchased and used this perfume, and whenever I go to a drug store, or other retail store, and ask for 'L'Origan' perfume, I expect to receive Coty's perfume, and nothing else. If I would ever see any advertisement of 'L'Origan' perfume, or of 'Origan' perfume, I would conclude that the advertiser was offering for sale Coty's perfume. and nothing else, and am certain that this would be the opinion of all of my acquaintances who use perfumes."

Another, who is not connected with the business in any way, but is, a user of perfumes, states that:

"The word 'L'Origan' indicates to me a brand of perfume produced by only one perfumer, namely, Coty. * * * If I saw an advertisement in which Macy's or some other department store would advertise the brand 'Origan,' I would conclude that the genuine Coty perfume was being offered for sale."

And there are a number of other affidavits from consumers to the like effect. But we do not find in the record, among all the affidavits which the Le Blume Import Co., Inc., has introduced, a single one representing the consuming public and stating that, if they asked for "L'Origan," they would not expect to receive Coty's perfume.

It cannot, however, be denied that in France there are a good many perfumers who are manufacturing a perfume called "Origan." One witness states that he found in Paris, in a volume called Registration of Trade-Marques, issued by the Bureau of Trade-Marques, 17 trade-marks registered by well-known perfumers of Paris, in which the word "Origan" occurred. "In every case, however," he says, "the word 'Origan' was followed by another descriptive word, whether the name of the manufacturer, or some other word designating the person, firm, or corporation manufacturing that particular origan pefume, as, for example, the word 'Origan' followed by the words 'La Fleur.'"

The treasurer of the Le Blume Import Company, which is the plaintiff in one of the suits and the defendant in the other now before the court, states:

"The perfume known as 'Origan' is not of itself distinctive of any manufacturer, either in France, the United States, or any other part of the world."

As to what means of knowledge he has concerning "any other part of the world" is not disclosed. What he says as to conditions in the United States is contradicted by the testimony in this record from well-informed sources; what he says as to conditions in France is, if true, not of controlling importance, so far as the validity of Coty's trade-mark in the United States is concerned. The testimony in the record, however, satisfies us that in this country the trade and the general public consider that "L'Origan" means the perfume made by Coty. It signifies a single perfume, coming from a single source, and well known to the perfume-consuming portion of the community. It is not necessary that "L'Origan" should be known to the whole perfume-consuming public as Coty's product in order to entitle his trade-mark to be protected. A great market in the United States has been created for that product, and to most persons in this country who buy perfumes "L'Origan" means Coty's product, and it meant that at the time of the registration of the trade-mark.

Perfumes are divided into two classes: Those which duplicate or attempt to duplicate the odor of a flower, such as rose, jamine, lilac, etc.; and those which are distinctive and original blends, in which there is no attempt to duplicate the odor of any flower or natural product. It is claimed that "L'Origan" belongs to the latter class of perfumes. We find in the record the affidavit of the head of the Parfumerie Houbigant of Paris, one of the oldest and best-known establishments

of its kind in the world, and which has been in continuous existence since prior to the French Revolution. His affidavit states:

"The perfume known as 'L'Origan' was first put upon the market in France by Coty, and it has always been recognized in France that Coty was the originator of this perfume. Coty's 'L'Origan' is what is known as a bouquet perfume; that is, it does not attempt to reproduce the odor of any particular flower, such as lilac, rose, or muguet, but it is a compound or synthetic odor, new to the sense of smell and not the reproduction of any hitherto existing odor."

There is abundant testimony in the record to the effect that "L'Origan" is a blend or bouquet, and that its odor is not that of any particular flower. The dean of the College of Pharmacy of Columbia University, a former president of the American Pharmaceutical Association at one time pharmacognosist in the United States Department of Agriculture, the author of several text-books on botany, and for many years professor of materia medica in the Bellevue Medical College and in New York University, states that he has traveled over most of South America, the whole of the United States, and through Mexico and the West Indies, in the study of drugs and of plant products. He has always paid special attention to the perfumery oils and the sources of perfume ingredients, and has been well acquainted for many years with the perfumery industry. The following is an excerpt from his affidavit:

"For many years I have been thoroughly acquainted with the members of the genus origanum. Origanum is the proper name of this group of plants. So far as I know the term 'Origan' is not known in the United States as the name of any of the members of this group, and I believe that this name has also become obsolete in Europe and has been so for 20 years or more. The leaf shown on the Coty box is not origanum or marjoram. The genus origanum is a large one, containing many species, of which about 20 have been used from time immemorial for medicinal purposes. So far as I know, no member of this genus has been used in perfume. * * * In other words, it is as impracticable to get a perfume from the members of the origanum genus as it would be to derive one from the tobacco plant or from pepper or garlic. It is equally impracticable to get a perfume from the marjoram plant. * * * I have smelled some of Coty's L'Origan perfume, and it certainly does not remind me in any way of any of the members of the origanum or marjoram group, or of any flower or plant with which I am acquainted."

A person of extensive experience in the business, referring to "L'Origan," says:

"I can state from my experience with this brand of perfume that it is a blend, and could not be duplicated by using the original essential oil produced from any particular flower."

Another, engaged in the manufacture of perfumes and who had an experience in that business for more than 20 years, says:

"I state most positively that the 'L'Origan' brand has absolutely no resemblance to the perfume or odor of any particular flower or floral product, but that it is an absolutely distinctive creation and blend, which required great ability and is of high excellence."

Still another says:

"I do not consider the name 'Origan' or 'L'Origan' the name of any floral odor, such as lily of the valley, lilac, heliotrope, or rose, but it is well known

that Coty's 'L'Origan' is a bouquet odor; that is, a mixture of a number of odoriferous materials, and not the reproduction of any natural scent."

There are affidavits made by 25 different and disinterested persons, who state that Coty's "L'Origan" is a distinctive blend, which resembles no flower or plant odor whatever. The weight of this evidence is not overcome. We have not overlooked the affidavit made by the president of a corporation which is engaged in importing into the United States hair goods, perfumes, and toilet accessories, and who has been in the business since 1912. He sets forth, as of his own personal knowledge, that the users of perfumes are aware that the designation "Origan" is the designation of a fragrance as standard as rose, violet, or any other well-known fragrance. We cannot accept the statement. If in this country the fragrance of "L'Origan" is as well known as that of rose or lilac, it certainly is not because the fragrance of the plant is here as well known as that of the rose or of the lilac. Nothing could be further from the truth than that. We are satisfied that whatever knowledge of the fragrance the public in the United States possesses it has derived from the extensive use the public has made of Coty's perfumes, and not from its knowledge of the flower which here is practically unknown to the public. A blend which represents no flavor may in time become as distinctive and standard a fragrance as one which represents a flower; and a blend which represents the fragrance of a flower which is rarely seen and almost unknown, and which contains no single ingredient of the flower itself, may in time become as standard and well known as any other fragrance.

There is nothing in the record which informs us that any plant of the genus origanum is grown or cultivated in this country. We may, however, take judicial notice of the fact that in the United States it is not a common plant or flower, and that its fragrance is not, like that of the rose or the lilac, a matter of common knowledge. Moreover, nothing was presented to the court below to show what the fragrance of origan is. As the District Judge said in his opinion:

"The Le Blume Company insist that the oils in evidence, which to my nose are like turpentine, do not smell like origan, but they produce nothing on which they will stand as the true smell."

And we fully agree with him that:

"The name of a scent, when descriptive, means, not that the compound contains it as an ingredient, but that it smells like the thing. It would be, for instance, misleading to name a scent rose or lilac, because it contained an imperceptible quantity of those essences, if it did not smell like the flowers. It is therefore quite idle to show that d'Heraud puts some origan in his scent, and that Coty does not. Neither fact has any bearing whatever on whether the name is true or false as description. A name means what people understand it to say."

[10] We do not at all question that words which are in general or common use and which are merely descriptive are publici juris and cannot be appropriated as a trade-mark. That is elementary law, which no one thinks of questioning. But we think that a word which is not in general or common use, and is unintelligible and non-descriptive to the general public, although it may be known to linguists and scientists,

may properly be regarded as arbitrary and fanciful, and capable of being used as a trade-mark or a trade-name; and a word which has become obsolete, which is unintelligible and nondescriptive to the general public, may be regarded as arbitrary and fanciful, and entitled to be used as a trade-mark. We are satisfied that upon this record the word "Lorigan" was properly registered as a trade-mark; and the trade-mark having been properly registered, it in our opinion protects perfume marked "L'Origan de Coty" from infringement. Perfumes marked "Origan-Heraud" in the markets of the United States infringe, and their sale here constitutes unfair competition.

In Nashville Syrup Co. v. Coca-Cola Co., 215 Fed. 527, 132 C. C. A. 39, Ann. Cas. 1915B, 358, it was held that the defendant did not escape infringement of the plaintiff's trade-mark "Coca-Cola" by marking its bottles "Fletcher's Coca-Cola," and it was said that "a trade-mark right which could be so avoided would be of no value." It was added that:

"To permit defendant to use them [the words 'Coca-Cola'] in connection with his own name is not to avoid or mitigate the wrong, but is rather an aggravation. * * *"

In Shaver v. Heller & Merz Co., 108 Fed. 821, 833, 48 C. C. A. 48, 60 (65 L. R. A. 878) the plaintiff, who manufactured washing powders called "American Ball Blue" and "American Wash Blue," was given an injunction against a firm of merchants who used the same words in connection with their powders, although they stated on the packages their own names as manufacturers thereof.

In what we have said herein upon the right of Coty to register his trade-mark in the United States, we have not been unmindful of the case of Dadirrian v. Yacubia, 90 Fed. 812, in which Judge Colt, sitting in the Circuit Court for the District of Massachusetts, held that the word "Matzoon," which had been for centuries in Armenia the name of an article of food or diet prepared from sterilized and fermented milk, could not be appropriated as a trade-name by the person who first introduced the article as well as the name into trade in this country. The case was carried to the Circuit Court of Appeals for the First Circuit, which affirmed it. In that case, however, the application for the trade-mark was filed on August 7, 1885. The person filing the application stated therein that he had used his trade-mark in his business since on or about July 17th of the same year. At the time the trade-mark was registered the name, therefore, could not have acquired a secondary meaning, or have become so identified in the public mind with the name of the manufacturer as to entitle him to appropriate it to his exclusive use. In that respect the case is plainly distinguishable from the instant case. In the former case the manufacturer had used the word upon his product for about three weeks before he applied for its registration. In the instant case Coty's perfumes began to be sold in the United States under the trade-name "L'Origan" in 1909, and the application for its registration was not made until 1920. In the 11 years which elapsed between the first use of the trade-name in the United States and the registration, during the whole of which period the word continued to be used here upon Coty's perfumes, the word had acquired a secondary meaning which entitled it to registration, even though it should be con-

ceded, for the sake of argument, that it originally was descriptive and as such not entitled to exclusive appropriation.

[11] Before concluding this opinion, we may say, lest it be thought we have overlooked the point, that we do not attach importance to the fact that it is admitted that Coty does not use in his perfumes the oil of origan, and that d'Heraud swears that the natural essence of his perfume "Origan" has as its principal base the natural essence of the origan plant. There is nothing in this record which shows that Coty, in using the word "L'Origan" on his perfumes, has perpetrated a fraud upon the public or in any way misled it, or that his perfume differs from the scent of the origan plant or what that scent in fact is. If d'Heraud's perfume has the true smell of "Origan," the court below thought, and we entertain the same opinion, that Coty's perfume smells of it, too. But it is idle to contend that the enormous business which has been built up in the United States for "L'Origan de Coty" has been attained by misleading the public into thinking that they are buying the fragrance of the flower origan. The perfume-buying public in this country never saw the flower nor smelled its fragrance. What they know is Coty's perfume and they buy it because it is exactly what it is. We agree with the court below that "there was no deceit in Coty's use of the word, for it did not and could not deceive those to whom it was addressed." The principle that he who comes into equity must come with clean hands is indisputable, but there is no reason for invoking it to destroy a business which has been gradually built up in this country upon its own merits and without fraud or deception.

There is much testimony from the experts to the effect that the oil of origanum is unquestionably not used as a perfume oil to give its distinctive odor, either in the pure condition or even as part of a blend, and that it certainly has never been used in the pure state as a perfume oil, or to give its odor to a perfume blend. This testimony comes, not only from the experts in the United States, but from those in Paris. Thus the head of Parfumerie Houbigant of Paris, a competitor of Coty's, states that "the use of oil of origanum, so far as my experience goes, is unknown among perfumes."

The testimony is convincing that Coty's perfume is a blend, and does not imitate any particular flower. It is admitted that Coty does not use the oil of origanum in its manufacture. D'Heraud says that he himself uses it. He may do so. But one of the experts states positively that d'Heraud's perfume "has no oil of origanum or anything like it therein to any extent which would make this perceptible to the sense of smell. This perfume has the same general odor as Coty's 'L'Origan,' but is cheaper and inferior. It does not have the odor of origanum or marjoram at all." And this stands uncontradicted.

It is said that the leaf of the flower is shown on the Coty box as an emblem. The dean of the School of Pharmacy of Columbia University states positively: "The leaf shown on the Coty box is not origanum or marjoram." And there is nothing in the record which shows that he is wrong in this statement.

The orders appealed from are affirmed.

MANTON, Circuit Judge (dissenting). The evidence here is in affidavit form, and therefore not as satisfactory as oral testimony in court, such as might be had at final hearing. But the dictionary authorities amply support the contentions of the defendants below that the word "origan" means the oil of origanum, and it has been known in the art or trade to be of "exceptional importance in the chemistry perfumes." The plant of origanum has long been marked as "remarkable for the essential oil to which its fragrance is due." The oil of origanum is described as yellowish or reddish yellow liquid, and the origan plant as common marjoram.

The plaintiff respondent uses the words "L'Origan de Coty" in its trade. The trade-mark is "Origan." The word which is trade-marked is not an arbitrary selection of a word. Indeed, the leaf of the flower or plant is used as an emblem. To be a word of fancy, it must obviously be meaningless. It must be a word fanciful in its application to the article to which it is applied, in the sense of being so obviously or noticeably appropriate as to be neither descriptive nor deceptive, nor calculated to suggest description nor deception. The weight of the evidence coming from authoritative sources, through affidavits produced, makes out a case of a word used which is descriptive, and therefore cannot be the subject of a trade-mark. Indeed, the defendant does not use its trade-mark "Origan" on its labels and bottles, but "L'Origan."

The injunction granted, and this affirmance thereof, I think, is contrary to the authoritative decisions. See Standard Paint Co. v. Trinidad Asphalt Co., 220 U. S. 446, 31 Sup. Ct. 456, 55 L. Ed. 536; Canal Co. v. Clark, 13 Wall, 323, 20 L. Ed. 581; Dadirrian v. Yacubian (C. C.) 72 Fed. 1010; Id., 98 Fed. 872, 39 C. C. A. 321; Thermogene Co. v. Thermozine Co., 234 Fed. 69, 148 C. C. A. 85.

I dissent.