STIX PRODUCTS, INC., Plaintiff,

v.

UNITED MERCHANTS & MANUFAC-
TURERS, INC., Defendant,

v.

The FIRESTONE TIRE & RUBBER COM-
PANY, Counterclaim Defendant.

No. 62 Civil 814.

United States District Court
S. D. New York.

Dec. 19, 1968.

See also, D.C., 273 F.Supp. 250.

Pennie, Edmonds, Morton, Taylor & Adams, New York City, for plaintiff and counterclaim defendant, Stanton T. Lawrence, Jr., Charles J. Brown, New York City, of counsel.

Kenyon & Kenyon, New York City, for defendant, John A. Reilly, Donald J. Lisa, Michael T. Platt, Paul H. Heller, John P. Kirby, Jr., Arthur D. Gray, Stroock & Stroock & Lavan, Milton N. Scofield, Alvin K. Hellerstein, New York City, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

The defendant, United Merchants & Manufacturers, Inc. (United), is the owner of the registered trade-mark CON-TACT.[1] The plaintiff, Stix Products, Inc. (Stix), commenced this action for a declaratory judgment that the trade-mark is invalid,[2] and further that its use of the word "contact" in the promotion and sale of its goods does not infringe United's trade-mark rights.[3] United counterclaimed, charging Stix with trade-mark infringement[4] and unfair competition,[5] and seeks injunctive relief.

1. 15 U.S.C. § 1051. The mark is also registered in stylized form as "Con-Tact."

2. 15 U.S.C. §§ 1064(c), 1065(4).

3. 15 U.S.C. § 1115(b) (4).

4. 15 U.S.C. § 1114.

5. 28 U.S.C. § 1338(b). United also charged on the same facts dilution under N.Y.Gen.Bus.Law, McKinney's Consol. Laws, c. 20, § 368–d and confusion as to the source of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The former claim has been dropped, and the latter, upon the facts of this case, is encompassed by this Court's disposition of the trade-mark and unfair competition claims. Cf. Federal-Mogul Bower Bear-

United later joined The Firestone Tire & Rubber Company (Firestone) as a counterclaim defendant, alleging against it the same charges of trade-mark infringement and unfair competition. Firestone asserted the same defenses as Stix and further alleged that it had merely assembled the components of the goods in bulk form on order from Stix.

Upon the trial United was deemed the lead-off litigant and presented its case first. The trial extended over a three-week period; almost 2,000 pages of testimony were taken, and hundreds of exhibits received in evidence.

### UNITED'S ACTIVITIES

United, for many years, has manufactured and sold textile products and synthetics. Its Comark Division makes a wide variety of plastic products, including those involved in this suit. In the early 1950's, David Silman, an employee of United and now President of Comark, created a new self-adhesive decorative plastic product for covering shelves, tables and other surfaces. It consists of a textile-sized sheet of plastic, having on one surface a decorative pattern and on the reverse surface a pressure-sensitive adhesive. A removable paper backing sheet, bearing the trade-mark, descriptive matter and instructions, covers the self-adhesive surface. The product is used by removing the backing sheet, applying the adhesive side to a surface with pressure and smoothing away any wrinkles or air bubbles. Retailers receive the product in large rolls from which they sell by the yard, and in small rolls which they sell as a unit.

Prior to the introduction of its new product, United decided upon the trade-mark CON-TACT. Before filing its first registration, United secured an assignment of the mark "CONTACT" from Dan River Mills, Inc., following which it decided upon its own logo-stylized script with hyphen form—CON-TACT. This mark was granted registration on the Principal Register for distinctive marks on November 8, 1955; [6] thereafter, thirteen additional registrations for the mark were issued, ten of which are in suit.

In July, 1954, United began to market its new product under the trade-mark CON-TACT and described it as a self-adhesive plastic. In August, 1954, CON-TACT was introduced in New York City department stores. It was advertised by Gimbels and Abraham & Straus, and was an immediate and sensational success; their stocks were depleted upon initial offering. Macy's soon ordered the product, followed by large chain stores and mail order houses. In the next few months sales increased to such an extent that United had difficulty in supplying the demand. The product, as well as the trade-mark, was given wide publicity in articles in contemporary newspapers and consumer and trade magazines. These articles used apt phrases in describing the product and also used the term CON-TACT as a trade-mark.[7]

Since the introduction of its initial line, United has marketed a variety of self-adhesive decorative plastics under the CON-TACT trade-mark.[8] United's

---

ings, Inc. v. Azoff, 313 F.2d 405, 409–410 (6th Cir. 1963); L'Aiglon Apparel, Inc. v. Lana Lobell, Inc., 214 F.2d 649, 651 (3d Cir. 1954); Geisel v. Poynter Prods. Inc., 283 F.Supp. 261, 267–268 (S.D.N.Y. 1968); Glenn v. Advertising Publications, Inc., 251 F.Supp. 889, 901–903 (S.D.N.Y. 1966).

6. The registration became incontestable in 1961, prior to the commencement of this action, upon the filing by United and acceptance by the Patent Office of an affidavit of continuous use. See 15 U.S.C. §§ 1065, 1115(b).

7. Cf. Feathercombs, Inc. v. Solo Prods. Corp., 306 F.2d 251, 254 (2d Cir.), cert. denied, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962).

8. The products so marketed have included: (1) regular self-adhesive plastic; (2) self-adhesive blackboards; (3) self-adhesive appliques ("cut-outs"); (4) transparent self-adhesive plastic; (5) calendars; (6) three-dimensional self-adhesive panels ("sculpture panels"); (7) heavy duty self-adhesive plastic ("top"); (8) acous-

licensee, Freydberg Manufacturing Co., has marketed ten additional products under the CON-TACT brand.[9] Arnel Plastron, a company wholly owned by United since 1961, markets a parallel line of self-adhesive decorative plastics under the trade-mark KWIK-KOVER, mainly for sales in discount stores.

Since 1955, United has engaged in extensive advertising and promotion of its CON-TACT brand products. These programs include (1) consumer advertising in national magazines and Sunday supplements, and cooperative advertising with retail dealers; (2) advertising in trade magazines; (3) advertising at point of sale through the use of placards, streamers, rack headers and give-aways in stores carrying CON-TACT trade-mark products; and (4) displays and special promotions.[10]

In advertising its CON-TACT brand products United has adopted a policy evidently designed to avoid the problem that arose in the *Thermos* case.[11] Through the years its advertising and promotional activities have featured: (1) a prominent display of the CON-TACT trade-mark; (2) descriptive or generic phrases in close proximity to the trade-mark; and (3) words and pictures telling and showing what the product is and how and where to use it. United has consistently used its trade-mark CON-TACT in conjunction with apt descriptive terms, both on the products themselves and in the advertising and display thereof. Typical of the terms used in conjunction with its trade-mark is the phrase "self-adhesive plastic."

From 1954 to 1959 United spent about one million dollars in advertising its CON-TACT products; the total for 1954 to 1968 is about five million dollars. Consumer exposures to the CON-TACT brand name have averaged, since 1955, about one hundred million a year, and for the year 1966, about one hundred fifty million; if retailers' cooperative advertising is included, the exposures are one billion annually.

Sales of CON-TACT brand products amounted to some twenty million dollars from 1954 to 1959 and to about ninety million dollars from 1954 to 1968. Today CON-TACT brand products account for approximately fifty to sixty per cent of all sales of self-adhesive decorating plastics in the United States which are sold by some 50,000 retail establishments. By 1958 United's products under its trade-mark CON-TACT had gained commercial acceptance, and the name was recognized by the industry and the purchasing public as a Famous Brand.

## COMPETITORS IN THE INDUSTRY

Since United introduced its CON-TACT brand in 1954, Stix and seventeen

---

tical ceiling tile; (9), embossed self-adhesive plastic sheeting; (10) self-adhesive plastic felt; (11) quilted self-adhesive plastic; (12) translucent self-adhesive plastic; (13) self-adhesive wall tile; (14) Christmas decorations; (15) flocked self-adhesive plastic; and (16) self-adhesive foil.

9. Freydberg's products have included: (1) metallic tape; (2) tape; (3) scalloped trim; (4) pleated trim; (5) appliance covers; (6) scalloped shelf lining; (7) textured trim; (8) pleated edge shelf lining; (9) quilted trim; and (10) foil trim.

10. E. g., a promotion directed to home economics teachers which provided some two million high school students with samples of CON-TACT brand products; also lectures to women's groups and other women's organizations on the nature and use of its products.

11. American Thermos Prods. Co. v. Aladdin Industries, Inc., 207 F.Supp. 9 (D. Conn.1962), aff'd sub nom. King-Seeley Thermos Co. v. Aladdin Industries, Inc., 321 F.2d 577 (2d Cir. 1963), where the trial court concluded that the plaintiff had failed to use due diligence to rescue the word "Thermos" from descriptiveness or genericness. 207 F.Supp. at 13, 15–19; 321 F.2d at 579. Cf. Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 199, 16 S.Ct. 1002, 41 L.Ed. 118 (1896) ("Singer"); DuPont Cellophane Co. v. Waxed Prods. Co., 85 F.2d 75, 77 (2d Cir.), cert. denied, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936) ("Cellophane"); Bayer Co. v. United Drug Co., 272 F. 505, 510–511 (S.D.N.Y.1921) ("Aspirin").

other firms have manufactured and sold self-adhesive decorative plastic products. Of these, sixteen continue to sell the product. Those in the industry, including Stix, have always described the product as "self-adhesive plastic," "self-adhesive decorative plastic," "self-adhesive decorating plastic," or variations thereof; however, in 1959 Stix commenced to use the word "contact" in captions and otherwise as hereinafter described. None of United's other competitors has ever used "contact" or any variation either in its advertising or promotional activities.

## STIX'S ACTIVITIES

Matthew Shulman, President of Stix, first learned of United's new product in about October, 1954, through buyers who showed him the product and said it was in short supply and in great demand.[12] He consulted with Firestone, following which, in November, 1954, he formed Stix and began to sell the product under the trade-mark STIX.[13]

From late 1954, when Stix began marketing its products under the trade-mark STIX, through 1959, its advertising in captions used such phrases as "SELF-ADHESIVE DECORATING PLASTIC," "THE AMAZING *Self-Adhesive* DURABLE MIRACLE PLASTIC," "*Fabulous New* PLASTIC *Decorating Material*," and "WASHABLE, DURABLE, SELF-ADHESIVE PLASTIC." The captions are placed in conspicuous positions in advertising and promotional material. They are eye-catching head-line or banner phrases designed to attract the quick attention of a prospective customer. At points of sale at retail outlets, the rolls of merchandise are displayed on a rack at the top of which and as part of the display is a rack header containing the eye-catching caption. The captions also appear on other point of sale devices, wrappers, backing sheets, packages, cartons and in advertising and other promotional material.

At no time during its first five years of business did Stix use the word "contact" in any form, either in its advertising or in its line of self-adhesive plastics. In late 1959 or early 1960, however, it commenced to use the word as part of the caption headline in all its advertising, promotional and sale display material.[14] Since that time it has advertised its products as "SELF-ADHESIVE CONTACT DECORATING PLASTIC." It also redesigned the Stix backing sheet to read "WASHABLE, DURABLE, *Self-Adhesive* CONTACT PLASTIC." The only change from the prior forms was the addition of the word "CONTACT."

Stix has followed the same policy with respect to its products sold under its other trade-marks. In 1963 Stix introduced its line of products to be sold in discount houses under the trade-mark ADORN, and in 1968 introduced two new lines under the trade-marks CARESSE and FAWN. ADORN, CARESSE and FAWN also have been advertised as "SELF-ADHESIVE CONTACT DECORATING PLASTIC," or "SELF-ADHESIVE CONTACT PLASTIC," or

---

12. Shulman, upon his pretrial deposition, stated that he had seen the CON-TACT product at Macy's in the "late summer" or October of 1954. At trial, however, he testified he did not recall having gone to Macy's, but that information as to the product had been reported to him by the buyers referred to above.

13. Absent patent rights, the mere copying of United's product, of course, provides no basis for a claim of unfair competition. Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 237–238, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 232–233, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964).

14. By late 1958 Stix had already abandoned its policy with respect to non-use of the term "contact." It had approved and had taken responsibility for the use of the phrases, "Peel off backing * * * sticks on contact," and "Sticks on contact * * * no paste," both of which appeared in advertisements displaying Stix products in the 1959 Sears, Roebuck spring-summer catalogue. Sears, Roebuck, on protest by United, desisted thereafter from the use of the word with respect to the products and has refrained ever since.

"CONTACT PLASTIC SHELF COVER." Since its introduction in 1963, the caption on the ADORN backing sheet has read, "self-adhesive contact decorating plastic." In addition, the backing sheet contains textual material, close to the caption, which reads: "ADORN is a self-adhesive contact decorating plastic that will adhere on contact without paste, water or glue to any smooth, clean, dry, nonporous surface." This was Stix's first use of "contact" in textual matter—that is, in complete sentences—as opposed to the caption use described above.

Since 1960 Stix has used the word "contact" without its trade-mark in its twice-yearly Famous Brand promotion sales of discontinued patterns of STIX at reduced prices. The phrase used is "FAMOUS BRAND *self-adhesive contact* DECORATING PLASTIC."

Also in line with its changed policy, Stix, since 1959, has prepared and distributed ad mats and other advertising material containing the word "contact" to its distributors and retailers throughout the country, and such material has been used by the dealers in different forms. Such mats were also distributed to the retailers in connection with the semi-annual Famous Brand promotion sales.

THE ISSUES

The issues have been narrowed since the commencement of suit. Stix has abandoned its original claim for a declaration that United's trade-mark is invalid and for a decree cancelling the registration. It now acknowledges that "United's trademark CON-TACT, made fanciful by the hyphen and often by stylized script, is recognized to be a brand by

sufficient consumers to warrant a finding that such mark is valid." But that acknowledgment is coupled with a denial of infringement based upon Stix's contention that it has never hyphenated "contact," nor used it as a trade-mark or in any form other than that which appears in dictionaries. As stated by Stix, "[T]he very essence of this litigation * * * is whether Stix's particular use of the word 'contact' is lawful or unlawful in relation to United's trademark CON-TACT."

The hard core of Stix's position, no matter how variously stated, is that its use of the word "contact" in advertising the Stix products is in the primary meaning of the word, is descriptive of the product, and conveys no identification in the public mind of United's CON-TACT brand products. In sum, it urges that "contact" alone or in phrases such as "contact paper" and "contact plastic" cannot be taken to mean CON-TACT brand paper—United's products.

Thus, in broad terms, the issues to be determined are whether (1) Stix infringed upon United's trade-mark rights, and (2) Stix's acts constituted unfair competition. As this Court has stated: "Whatever route one travels, whether by trade-mark infringement, or unfair competition, the signs give direction to the same inquiry—whether the use of ['contact'] * * * is likely to cause confusion or to deceive purchasers that [United] * * * is the source of [the product] * * *. The basic test of both claims is the same." [15]

That the word "contact" alone, whether spelled with a capital or lower case "c", used in connection with the

15. Atlantic Monthly Co. v. Frederick Ungar Publishing Co., 197 F.Supp. 524, 529 (S.D.N.Y.1961). See Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 325, 59 S.Ct. 191, 83 L.Ed. 195 (1938); American Steel Foundries v. Robertson, 269 U.S. 372, 380, 46 S.Ct. 160, 70 L.Ed. 317 (1926); Lincoln Restaurant Corp. v. Wolfies Rest. Inc., 291 F.2d 302, 303 (2d Cir.), cert. denied, 368 U.S. 889, 82 S.Ct. 143, 7 L.Ed.2d 88 (1961); Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607, 614 (2d Cir.), cert. denied, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960); Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 542 (2d Cir. 1956); Miles Shoes, Inc. v. R. H. Macy & Co., 199 F.2d 602, 603 (2d Cir. 1952), cert. denied, 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953); G. B. Kent & Sons, Ltd. v. P. Lorillard Co., 114 F.Supp. 621, 629–630 (S.D.N.Y.1953), aff'd on opinion below, 210 F.2d 953 (2d Cir. 1954).

products, is a colorable imitation of United's trade-mark CON-TACT, does not admit of serious dispute. The similarity is most striking in speech. When spoken, the words sound alike; this more than satisfies the requirements of the familiar "idem sonans" rule.[16] As Shulman, President of Stix, put it in a memorandum circulated to his sales personnel: "It's awfully hard to 'hear the difference' between the trade mark, 'Con-Tact' and the English word, 'contact' when spoken."[17] The absence of a hyphen [18] in Stix's use of "contact" is of no significance; it is "a distinction without a difference."[19]

Nevertheless, Stix contends that its use of "contact" has been limited to the primary or descriptive meaning of the word and is a non-trade-mark use. The inquiry, then, is whether the ordinary English word "contact" serves any descriptive function in connection with the product in question.

Stix first seeks to justify its inclusion of "contact" in its captions on the basis of dictionary definitions. It argues that when the backing paper of the product is removed, the film is "placed in contact" with the surface and "adheres on contact" or "sticks on contact"; thus, it contends its use of the word "contact" in its captions accords with dictionary meaning to express the idea that the plastic film adheres or sticks when placed in contact with the surface.

16. See Thaddeus Davids Co. v. Davids Mfg. Co., 233 U.S. 461, 472, 34 S.Ct. 648, 58 L.Ed. 1046 (1914) ("Davids" infringed by "C. I. Davids"); Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F. 2d 755 (2d Cir. 1960) ("Brylcreem" infringed by "Valcream"); G. D. Searle & Co. v. Chas. Pfizer & Co., 265 F.2d 385 (7th Cir.), cert. denied, 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65 (1959) ("Dramamine" infringed by "Bonamine"); Douglas Labs. Corp. v. Copper Tan, Inc., 210 F.2d 453 (2d Cir.), cert. denied, 347 U.S. 968, 74 S.Ct. 779, 98 L.Ed. 1109 (1954) ("Coppertone" infringed by "Copper Tan"); Miles Shoes, Inc. v. R. H. Macy & Co., 199 F.2d 602 (2d Cir. 1952), cert. denied, 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953) ("GRO (representation of a tree) SHOE" infringed by "GROPALS"); Telechron, Inc. v. Telicon Corp., 198 F.2d 903 (3d Cir. 1952) ("Telechron" infringed by "Telicon"); Le Blume Import Co. v. Coty, 293 F. 344, 359 (2d Cir. 1923) ("L'Origan" infringed by "Origan"); Stephano Bros. v. Stamatopoulos, 238 F. 89 (2d Cir. 1916) ("Rameses" infringed by "Radames"); Safeway Stores, Inc. v. Stephens, 281 F.Supp. 517 (W.D.La. 1967) ("Safeway" infringed by "Save-Way"); Hobart Mfg. Co. v. Kitchen Aid Serv., Inc., 260 F.Supp. 559 (E.D.N.Y. 1966) ("KitchenAid" infringed by "Kitchen Aid"); Allen v. Walker & Gibson, 235 F. 230 (N.D.N.Y.1916) ("Cedarine" infringed by "O-Cedar"); National Biscuit Co. v. Baker, 95 F. 135 (C.C.S.D.N.Y. 1899) ("Uneeda" infringed by "Iwanta"); Frostie Co. v. Sun-Glo Packers, Inc., 315 F.2d 932, 50 CCPA 1160 (C.C.P.A.1963) ("Frostie" vs. "Frosty Inn"; latter not entitled to registration). See also Best & Co. v. Miller, 167 F.2d 374, 379–380 (2d Cir.) (Clark, J., dissenting), cert. denied, 335 U.S. 818, 69 S.Ct. 39, 93 L.Ed. 373 (1948), for other examples.

17. Thus, Stix's present contention that "when spoken in a natural fashion, 'contact paper' cannot possibly mean 'CONTACT' paper' in the brand sense but necessarily is a general designation for the class of goods," is a "form of technical gymnastics." LaTouraine Coffee Co. v. Lorraine Coffee Co., 157 F.2d 115, 117 (2d Cir.), cert. denied, 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663 (1946).

18. "The specific form in which the mark [is] registered * * * cannot be here controlling, whether the words 'Coca Cola' are with or without a hyphen, or are in script or in plain letters." Nashville Syrup Co. v. Coca Cola Co., 215 F. 527, 530 (6th Cir. 1914). See also LaTouraine Coffee Co. v. Lorraine Coffee Co., 157 F.2d 115, 117 (2d Cir.), cert. denied, 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663 (1946).

19. "The attempt of the defendant to distinguish between the five letters 'S.P.I.G.A.' and the word 'Spiga' where the letters were not separated seems to be essentially a distinction without a difference." Pastificio Spiga Societa Per Azioni v. De Martini Macaroni, 200 F.2d 325, 326 (2d Cir. 1952). Cf. United Merchants & Mfrs., Inc. v. R.A. Prods., Inc., 150 U.S.P.Q. 205, 207 (P.O.T.T. & A. 1966): "The marks 'CON-TACT' and 'CONTACT' must, for purposes of a[n opposition] proceeding of this character, be considered to be identical."

Assuming arguendo that the phrases "adheres on contact," "placed in contact" or "sticks on contact" describe a characteristic or function of the product, the dictionaries lend no support to Stix's contention that the word "contact," as used in the captions, is descriptive of the product. The simple fact is that no dictionary defines "contact" as a self-adhesive decorative plastic of any sort. Stix brushes this off as "evidence of the obvious fact that all words and phrases, particularly phrases, are not in the dictionaries." [20] However, Dr. Bergan Evans, a distinguished and nationally recognized philologist and lexicographer, and Mr. Jess Stein, another noted expert, the editor in charge of the Random House Dictionary, whose testimony the Court accepts, testified that "contact" had not yet achieved usage as a concept of adhesion and is not contained in any dictionary in that sense. The lexicographers were in accord that the word is not descriptive of the products in question.[21]

■ A test of descriptiveness is whether the word conveys the characteristics, functions, qualities or ingredients of a product to one who has never seen it and does not know what it is.[22] So tested, the word "contact" by itself does not convey to one unfamiliar with self-adhesive decorating plastics the quality of self-adhesion and the means by which the product is applied.[23] The same holds true for the use of the word as part of a phrase—"contact paper" and "contact plastic" also have no primary or dictionary meaning in relation to the products.

■ Stix's reliance on various magazine articles dealing with adhesives and using the word "contact" is also misplaced. Not one of these uses indicates that the word "contact" alone is in any way descriptive of the adhesive property of the goods.[24] To the contrary, all of the articles use the word either to mean "touch" or to indicate the degree of pressure required to achieve adhesion.[25]

20. Stix's cavalier disregard of the lack of dictionary evidence to support its position conflicts with its assertion that it has never used "contact" as a trade-mark, nor "in any form other than that which appears in dictionaries."

21. Mr. Stein did find "contact paper" in several of the dictionary sources he consulted, "but there it referred solely to the meaning in photography, a sense in which it has no relationship whatever to the product being discussed here." Stix's own expert linguist was unable to testify that "contact" alone is understood to refer to the class of products involved here. At one point he said he thought it did, on the basis of some of the letters he had been shown, but he later conceded that he was guessing, and that "to estimate [the development of the word] in the foreseeable future is dangerous * * *."

22. William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 528, 44 S.Ct. 615, 68 L.Ed. 1161 (1924); Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 700 (2d Cir. 1961); Le Blume Import Co. v. Coty, 293 F. 344, 351 (2d Cir. 1923); cf. Selchow v. Baker, 93 N.Y. 59, 65 (1883); Independent Nail & Packing Co. v. Stronghold Screw Prods., Inc., 205 F.2d 921, 925 (7th Cir.), cert. denied, 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391

(1953); Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 905–906 (3d Cir. 1952); Standard Brands, Inc. v. Smidler, 151 F. 2d 34, 36 (2d Cir. 1945); W. G. Reardon Labs., Inc. v. B. & B. Exterminators, Inc., 71 F.2d 515, 517 (4th Cir. 1934).

23. Shulman testified that the particular quality of adhesion is the "unique" property of these products.

24. These include, among others, "contact labels," "contact cement," "contact-bonding adhesive" and "contact type adhesive."

25. Several of the articles contain glossaries of terms; not one refers to "contact," "contact paper" or "contact plastic." Typical of the uses of the word "contact" in such glossaries are the following: "Faying surface: Surface of an object which comes in contact with another object to which it is fastened." "Tack, dry: Property of certain adhesives * * * to adhere on contact with themselves at a stage of evaporation * * *." "Contact pressure: The normal pressure that results when two surfaces come in contact without any other external force." "Contact bonding—Type of adhesive * * * which bonds to itself on contact although solvent evaporation has left it dry to the touch."

Furthermore, virtually all the articles come from trade rather than consumer publications; thus, Stix's evidence is beside the point. In determining whether the word "contact" is descriptive, its meaning to a nonpurchasing segment of the population is not of significance; rather, the critical question is what it means to the ultimate consumer.[26]

Stix's position is not supported by the fact stressed by it that the Patent Office Trademark Trial and Appeal Board viewed United's trade-mark as "highly suggestive" with "the orbit of protection * * * less than that afforded a strong or arbitrary mark."[27] Stix overlooks the essential difference between a term that is suggestive and one that is descriptive; the former can be a valid trade-mark and is entitled to full protection as such.[28] A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.[29] The test is "whether the subject is so close and direct that it is apparently descriptive and generally useful in approximately that form to all merchants marketing such goods, or is so remote and subtle that it is fanciful and not needed by other merchants of similar goods."[30] The word "contact," without more, conveys no information as to the unique adhesive characteristic or function of self-adhesive decorative plastic; more than mere observation is required to reach the conclusion that a product so branded is a self-adhesive decorative covering, that it may be applied to a surface with ease upon fingertip pressure, and that when so applied, it adheres to the surface. CON-TACT has been accepted by the Patent Office on fourteen separate occasions for United's self-adhesive decorating plastics. Since the Patent Office is empowered to refuse registration of a mark that is "merely descriptive" of goods,[31] its repeated acceptances of United's mark for registration are of some substantial significance—they repel rather than support Stix's contention of descriptiveness.[32]

In support of its contentions Stix also relies upon linguistic analysis, consumer surveys and the testimony of Shulman, its President. Its linguistic expert grounded his opinion upon the concept that the spoken stress pattern of a com-

26. Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 699 (2d Cir. 1961); Restatement, Torts, § 721, comment c (1938).

27. United Merchants & Mfrs., Inc. v. R. A. Prods., Inc., 150 U.S.P.Q. 205, 208 (P.O. T.T. & A.1966).

28. Feathercombs, Inc. v. Solo Prods. Corp., 306 F.2d 251, 255 (2d Cir.), cert. denied, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962); Q-Tips, Inc. v. Johnson & Johnson, 206 F.2d 144, 146 (3d Cir.), cert. denied, 346 U.S. 867, 74 S.Ct. 106, 98 L. Ed. 377 (1953); Independent Nail & Packing Co. v. Stronghold Screw Prods., Inc., 205 F.2d 921, 925 (7th Cir.), cert. denied, 346 U.S. 886, 74 S.Ct. 138, 98 L. Ed. 391 (1953); Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 906 (3d Cir. 1952); Le Blume Import Co. v. Coty, 293 F. 344, 351 (2d Cir. 1923). See also Adolf J. Mainzer, Inc. v. Gruberth, 237 App.Div. 89, 91–92, 260 N.Y.S. 694, 697 (1st Dep't 1932), aff'd, 262 N.Y. 484, 188 N.E. 30 (1933). See generally E. Vandenburgh, Trademark Law and Procedure, § 4.30 at 60 (1959); 3 R. Callman, The Law of Unfair Competition and Trade-Marks, § 71.2 at 1087 (2d ed. 1950).

29. William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 528, 44 S.Ct. 615, 68 L.Ed. 1161 (1924); W. G. Reardon Labs., Inc. v. B. & B. Exterminators, Inc., 71 F.2d 515, 517 (4th Cir. 1934).

30. 3 Restatement, Torts, § 721 comment a (1938); cf. Douglas Labs. Corp. v. Copper Tan, Inc., 210 F.2d 453, 455 (2d Cir.), cert. denied, 347 U.S. 968, 74 S.Ct. 779, 98 L.Ed. 1109 (1954).

31. 15 U.S.C. § 1052(e) (1).

32. Cf. Aluminum Fab. Co. of Pittsburgh v. Season-All Window Corp., 259 F.2d 314, 317 (2d Cir. 1958); Miles Shoes, Inc. v. R. H. Macy & Co., 199 F.2d 602, 603 (2d Cir. 1952), cert. denied, 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953).

pound phrase reflects whether one is using the phrase as a trade-mark or as a generic term. The expert had conducted his "own little survey" of thirty persons while on a speaking tour of military installations. His opinion was that "contact paper," when spoken in a natural fashion, cannot mean CON-TACT paper in the brand sense, but is a general designation of the class of goods.

The Court, after observation of this witness and study of his testimony and his theory, finds his judgment unpersuasive. His study was confined to "contact paper," a phrase not used by Stix in its advertising; he did not include other phrases, such as "contact plastic," which Stix also contends has achieved generic status; he did not inquire about "contact decorating plastic," a phrase regularly used by Stix in its captions. He conceded that the spoken word "contact" alone would not, under his stress pattern concept, reveal whether the speaker used it in a generic or trade-mark sense.[33] Significantly, he also acknowledged that his opinion applied only to "contact paper" when *spoken* and that he could not tell whether when *written* the phrase conveyed a descriptive or a trade-mark meaning to its viewers. The idea that a particular intonation, stress pattern or pronunciation used by a customer governs whether she is asking for a brand name or is describing a class of goods disregards the polyglot nature of consumers and their differences in speech, dialect and language.[34] That stress patterns in a compound phrase may convey generic meaning to a linguist, a scientific language expert, does not necessarily make the phrase generic as far as the consuming public is concerned. As our Court of Appeals has observed, a word may be "capable of trademark usage, even though to linguists or scientists the name might have a descriptive connotation."[35]

Dictionary definitions and linguistics aside, Stix contends that the word "contact," either alone or in such combinations as "contact paper" and "contact plastic," has by consumer usage become a generic term for the products, whatever their origin or source; that when a consumer uses such terms she is not referring to CON-TACT, United's brand of goods, but applying a general designation for self-adhesive decorative plastics; that she means the product and

33. "Q If the word 'contact' was used by a group of people alone, could you ascertain from their stress patterns whether it were generic or a trademark?
"A No. It is only when you put 'paper' after it and put 'contact' and 'paper' together in a two-part word."

34. "THE COURT: Does that mean if there were mispronunciation by your wife it would have made a difference in your judgment as to whether or not it was a generic term or non-generic term?

"THE WITNESS: Only if the mispronunciation had been consistent. If she had consistently said 'Contact paper' with the Number 1 pattern, that would have told me it was a brand name.
"THE COURT: In other words, your judgment as to whether or not it is a generic term is the manner in which your wife pronounced the term?

"THE WITNESS: Yes, and since I became aware of the case and was aware I was going to be a witness here, I have been running my own little survey. * * *

\* \* \* \* \*
"THE COURT: If I understand you correctly from your description on the board, the determination of whether or not a word has a generic meaning or acceptance is based in very substantial manner upon pronunciation?
"THE WITNESS: Yes, sir.
"THE COURT: Is that correct?
"THE WITNESS: Yes.
\* \* \* \* \*
"THE COURT: Would the fact that a purchaser is a non-native make any difference in terms of intonation?
"THE WITNESS: Yes, sir. Other languages use other intonation systems.
"THE COURT: Then that very circumstance would make the difference as to what product the salesman would think the purchaser is asking for?
"THE WITNESS: Oh, yes. He probably would have to ask 'What particular brand do you want?' "

35. Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 699 (2d Cir. 1961); cf. Le Blume Import Co. v. Coty, 293 F. 344, 358–359 (2d Cir. 1923).

not the source of the product.[36] To support this contention, Stix relies upon consumer surveys taken at various periods, and also the testimony of Shulman, its President. That evidence, however, including Stix's own survey, persuasively points in the opposite direction.

The basic question, one of fact, under the test formulated many years ago by Judge Learned Hand and followed since, is: "What do the buyers understand by the word for whose use the parties are contending?"[37] The standard to be applied in determining whether a term is generic is not whether it has *some* significance to the public as an indication of the nature or class of the article, but whether that is its *principal* significance.[38]

As to the surveys,[39] the Crossley, S–D survey, commissioned by Stix on the eve of trial, reflected that when 694 female heads of households were asked the question, "What do you call this type of product," 498 (72%) did not use the word "contact" in any response; 196 (28%) used the word "contact" in some form in answer to the question; and of

36. "The distinction between descriptive and generic terms is a matter of degree. * * * [A] generic name conveys information with respect to the nature or class of an article, whereas a descriptive term supplies the characteristics and qualities of the article, its color, order, functions, dimensions, and ingredients." 3 R. Callman, The Law of Unfair Competition and Trade-Marks, § 70.4, at 1057 (2d ed.1950). In sum, "a generic term * * * identifies the general nature of an article, whereas a descriptive term indicates its special characteristics." 3 id. § 70.4, at 18 (1965 Supp.). See also 1 H. Nims, The Law of Unfair Competition and Trade-Marks, § 41, at 166 (4th ed. 1947); Jewel Tea Co. v. Kraus, 88 F. Supp. 1003, 1005 (N.D.Ill.), modified on other grounds, 187 F.2d 278 (7th Cir. 1950).

37. Bayer Co. v. United Drug Co., 272 F. 505, 509 (S.D.N.Y.1921); cf. Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 699–701 (2d Cir. 1961); Independent Nail & Packing Co. v. Stronghold Screw Prods., Inc., 205 F.2d 921, 925–926 (7th Cir.), cert. denied, 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391 (1953); DuPont Cellophane Co. v. Waxed Prods. Co., 85 F.2d 75, 81 (2d Cir.), cert. denied, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936); Le Blume Import Co. v. Coty, 293 F. 344, 353–358 (2d Cir. 1923).

38. Feathercombs, Inc. v. Solo Prods. Corp., 306 F.2d 251, 256 (2d Cir.), cert. denied, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962); cf. Coca-Cola Co. v. Koke Co. of America, 254 U.S. 143, 147, 41 S.Ct. 113, 65 L.Ed. 189 (1920); Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U.S. 537, 547, 11 S.Ct. 396, 34 L.Ed. 997 (1891); Community of Roquefort v. William Faehndrich, Inc., 303 F.2d 494, 497 (2d Cir. 1962).

39. The surveys are not excludable per se under the hearsay rule, but each must satisfy the requirements of necessity and trustworthiness. Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F.Supp. 670, 680–686 (S.D.N.Y.1963); Wembley, Inc. v. Diplomat Tie Co., 216 F.Supp. 565, 571–572 (D.Md.1963); Miles Labs., Inc. v. Frolich, 195 F.Supp. 256, 262 (S.D.Cal.), aff'd per curiam, 296 F.2d 740 (9th Cir. 1961), cert. denied, 369 U.S. 865, 82 S.Ct. 1030, 8 L.Ed.2d 84 (1962); American Luggage Works, Inc. v. United States Trunk Co., 158 F.Supp. 50, 53 (D.Mass. 1957), aff'd sub nom. Hawley Prods. Co. v. United States Trunk Co., 259 F.2d 69, 78 (1st Cir. 1958); cf. G. & C. Merriam Co. v. Syndicate Publishing Co., 207 F. 515, 518 (2d Cir. 1913), appeal dismissed for want of jurisdiction, 237 U.S. 618, 35 S.Ct. 708, 59 L.Ed. 1148 (1915); United States v. Aluminum Co. of America, 35 F.Supp. 820, 823–824 (S.D.N.Y. 1940), rev'd on other grounds, 148 F.2d 416 (2d Cir. 1945). See also United States v. 88 Cases, etc., 187 F.2d 967, 974 (3d Cir.), cert. denied, 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648 (1951) (not hearsay at all, but a showing "as a fact [of] the reaction of ordinary householders and others of the public generally"); Marcalus Mfg. Co. v. Watson, 156 F. Supp. 161, 164 (D.D.C.1957), aff'd per curiam, 103 U.S.App.D.C. 299, 258 F.2d 151 (1958) (state of mind exception). And see C. McCormick, Evidence, § 296, at 620 n. 5 (1954); see generally Judicial Conference of the United States, Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 425–430 (1960). The necessity criterion is no doubt met here, for the question of popular understanding of the word "contact" and recognition of the trade-mark CON-TACT is the paramount issue in the case, and surveys present a practicable way of introducing such evidence.

those 196, at least 135 (69%) knew "contact" was a brand.[40] This survey reflects that the majority of consumers do not use "contact" as a general designation for the goods, and further supports this Court's finding that the word "contact" alone serves no descriptive purpose.[41]

A Harris survey, commissioned in 1962 by United for purposes unrelated to this litigation, confirmed that CON-TACT is widely known as a self-adhering product—that the majority of consumers showed trade-mark recognition of CON-TACT.[42]

A survey by Batten, Barton, Durstine and Osborne in November, 1967, also on behalf of United, concluded that 84.5% of those interviewed recognized CON-TACT as a brand name.[43]

In sum, the survey evidence establishes that the word "contact" is not used or recognized by the majority of the purchasing public as descriptive of or a generic term for self-adhesive decorative plastics; that the majority recognize CON-TACT to be a brand name and a symbol of origin for such products; that the word "contact," however used, either alone or in phrases, is also recognized by the public as a brand name for such products; that CON-TACT is a famous brand and the dominant brand for self-adhesive decorative plastics. Since each of the three surveys tested consumer usage of the word by means of oral rather than written questions, taken as a whole they go far to refute Stix's contention that only United's printed form of the word, with its hyphen and distinctive logo-style script, is entitled to trade-mark protection.

Stix's final reliance in support of its position is the testimony of Shulman, its President, who asserted that as a result of investigation and experience he had concluded by 1959 that consumers and buyers were calling the product "contact, contact paper, contact plastic. When I say 'contact' I mean small 'c' and generically." While professing skepticism at first about such uses, deeming them "freaks or anomalies of some sort," he became convinced that "sophisticated buyers and unsophisticated consumer[s]" were "indeed calling [the product] * * * by this peculiar term." His information, he testified, came from conversations with buyers, a "pretty hardbitten, sophisticated, trademark-wise people," merchandise managers, store presidents, other executives and his own sales personnel. Shulman's assertion of what these tradespeople told him the general public was calling the product is, of course, double hearsay. And passing for the moment that the critical issue is not what some tradespeople were calling the product, but how the terms were understood and used by the buying

40. The full question put to the respondents was: "Would you please examine these *two packages carefully* [*handing* KWIK-KOVER and ADORN rolls, from the latter of which the word "contact," appearing three times, had been removed], and then tell me what *you* call this type of product?"

41. The sampling was a controlled area type close to the distribution of the total United States population and comparing favorably to the national census figures for age, income and race. The reliability of the sample is not in dispute.

42. The Harris survey established the existence of widespread familiarity with United's product. Of a total of 890 adults interviewed, 352 were users and 127 were familiar with the product but had not tried it.

43. The sample consisted of 1015 female heads of households. Although the form of the questions put to the interviewees could have been improved, cf. American Thermos Prods. Co. v. Aladdin Industries, Inc., 207 F.Supp. 9, 20–21 · (D. Conn.1962), aff'd sub nom. King-Seeley Thermos Co. v. Aladdin Industries, Inc., 321 F.2d 577 (2d Cir. 1963), the survey clearly reflects the outstanding position of United's product in the minds of the consuming public. The unaided brand awareness for CON-TACT was 19.4%, for STIX .6%, for ADORN .3%. The aided brand awareness for CON-TACT was 65.1%, for STIX 34.6%, for ADORN 15.0%.

public,[44] it is significant that of the thousands of persons engaged in the marketing of the products and presumably having direct knowledge of consumer usage and understanding, not a single alleged extrajudicial declarant was called to support Shulman's testimony.[45] And even more significantly, although Shulman claimed he had been present at point of sale display stands "hundreds of times" when customers in conversations with store clerks used "contact paper" descriptively or generically, not a single sales clerk or consumer was produced to substantiate Shulman's wide-ranging and self-serving statements.[46]

Based upon the record, my trial notes and a study of the entire transcript, I find Shulman's testimony unacceptable. His testimony, at times glib and facile, was marked by palpably evasive and irrelevant replies to critical inquiry. Its substance reveals a deliberate effort to conceal, behind a maze of conflicting and equivocal explanations, Stix's true purpose in its use of "contact" in its advertising and promotional material. Shulman's purposeful conduct emerges from the entire record and is emphasized by demeanor evidence. His claim that by 1959 the word "contact" and related phrases had become generic for the goods was the product of his own creation. The conclusion is compelled that it was part of a planned and aggressive campaign to devitalize or destroy the value of United's mark in an effort to force it into the public domain.

The record, however, demonstrates that Stix failed of its purpose with the ultimate consumer. The majority of the purchasing public did not and does not now use the word "contact" or the phrases "contact paper" or "contact plastic" to describe self-adhesive decorative plastic products; they do not recognize or use such expressions as an indication of the nature or class of such products. The majority of those who do use the expressions are aware that CON-TACT is a brand name, even apart from its hyphenated and stylized form, and use the terms interchangeably with United's CON-TACT mark to identify the products as coming from a single source; no matter how spelled, CON-TACT is recognized as a brand name for self-adhesive decorative plastics.

■ The Court concludes that Stix's use of "contact" in its captions, whether in lower case, with a capital "C", in block letters or without a hyphen, is a trademark use; it is not a primary or descriptive or generic use, but is an infringement of United's registered mark CON-TACT.

The infringement claim is "but a part of the broader law of unfair competi-

44. Cf. Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 699 (2d Cir. 1961); Bayer Co. v. United Drug Co., 272 F. 505, 509 (S.D.N.Y.1921); National Biscuit Co. v. Baker, 95 F. 135 (C.C. S.D.N.Y.1899).

45. One witness, not an alleged declarant, was called; his testimony, to say the least, was dubious. This witness, a New England discount house retailer of Adorn, confused Kwik-Kover and Magic Cover (other trade-marked decorative plastics) and conceded that customers at his store never ask for just "contact"; when questioned about his store practice with respect to trade-mark observances, he requested and was granted permission to refuse to answer.

46. Other evidence offered by Stix to support its contention that "contact" either alone or in phrases has acquired descrip-

tive significance does not merit extended discussion. For instance, Stix relies upon a brochure distributed by the Archer Label Company, which manufactured "Contact Labels" in the 1950's. The product was covered on one side with a pressure-sensitive adhesive and a removable paper backing. One unfamiliar with the Archer product would not have become aware of its self-adhesive properties upon seeing or hearing the word "contact," because the word does not convey the notion of adhesiveness.

Also of no probative value are the consumer letters that Stix relies upon as evidence of popular usage of the word "contact" in a descriptive sense. Shulman kept "some" of these letters in the file; the remainder he simply "discarded in the normal course of events." There was no attempt to retain the letters that did not use the word "contact."

tion," [47] and the law applicable to both is substantially the same. The essence of both claims is that the use of the infringing term creates the likelihood of consumer confusion; the facts supporting both are also substantially the same.[48] The essential inquiry is whether an appreciable number of ordinarily prudent prospective purchasers are likely to be confused or misled into believing that United's CON-TACT brand products are offered when "contact" appears in the captions of advertising and promotional material displayed and distributed by Stix.[49] The issue is one of fact as to the probable or actual reaction of such purchasers.

Not only was there likelihood of confusion, but the case abounds with instances of actual confusion, deception of customers and even passing off by retailers who used advertising material supplied by Stix.

Stix's products are the same as United's. The firms are in direct competition. The market is national. The products are distributed and sold through the same types of outlets at the wholesale and retail levels—department stores, mail order houses, chain stores, supermarkets, hardware stores, paint stores, lumber yards and other retail outlets. Advertising and sales promotion methods are substantially the same. Product displays at points of sale, accompanied by advertising material, are an important method of sales promotion. Rack headers with their eye-catching captions are prominently displayed above the products.

Originally, the word "contact" was inserted in the Stix and Adorn captions so that they read, "SELF-ADHESIVE CONTACT DECORATING PLASTIC" or "WASHABLE, DURABLE, *Self-Adhesive* CONTACT PLASTIC." Gradually, the captions were shortened, with the result that the word was given greater prominence and brought into sharper focus. Eventually, Stix became bolder in directly approaching United's mark. Thus, when it introduced its CARESSE and FAWN products, "contact" was displayed prominently at the beginning of the caption, as follows:

CONTACT PLASTIC
SHELF COVER,

a direct rather than a subtle trespass upon United's mark.

The effect of the word "contact" in all of Stix's captions is to create an association in the mind of the viewer between the Stix products and United's CON-TACT. Whether looking at the rack header at the point of sale, or reading a newspaper advertisement,

47. Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 413, 36 S.Ct. 357, 60 L.Ed. 713 (1916).

48. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 325, 59 S.Ct. 191, 83 L.Ed. 195 (1938); American Steel Foundries v. Robertson, 269 U.S. 372, 380, 46 S.Ct. 160, 70 L.Ed. 317 (1926); Lincoln Restaurant Corp. v. Wolfies Rest. Inc., 291 F.2d 302, 303 (2d Cir.), cert. denied, 368 U.S. 889, 82 S.Ct. 143, 7 L.Ed.2d 88 (1961); Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607, 614 (2d Cir.), cert. denied, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960); Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 542 (2d Cir. 1956); Miles Shoes, Inc. v. R. H. Macy & Co., 199 F.2d 602, 603 (2d Cir. 1952), cert. denied, 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953); Atlantic Monthly Co. v. Frederick Ungar Publishing Co., 197 F.Supp. 524, 529 (S.D.N.Y.1961); G.B. Kent & Sons, Ltd. v. P. Lorillard Co., 114 F.Supp. 621, 629–630 (S.D.N.Y.1953), aff'd on opinion below, 210 F.2d 953 (2d Cir. 1954).

49. Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607, 614 (2d Cir.), cert. denied, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960); Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 542 (2d Cir. 1956); Miles Shoes, Inc. v. R. H. Macy & Co., 199 F.2d 602, 603 (2d Cir. 1952), cert. denied, 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953); Atlantic Monthly Co. v. Frederick Ungar Publishing Co., 197 F.Supp. 524, 530 (S.D.N.Y.1961); G. B. Kent & Sons, Ltd. v. P. Lorillard Co., 114 F.Supp. 621, 629–630 (S.D.N.Y.1953), aff'd on opinion below, 210 F.2d 953 (2d Cir. 1954).

the customer sees the word "contact" in the caption and is likely to believe he is purchasing CON-TACT brand. It is not necessary that the similarity of the expression employed be such as to deceive the cautious consumer; it is enough if the similarity is such as to deceive the ordinary purchaser.[50] The average consumer, aware that CON-TACT is a brand name for a best-selling product, can hardly be expected to make a close or microscopic examination of the caption to ascertain whether "contact" has a hyphen, is stylized, is spelled with a capital "C" or is entirely capitalized. The law does not require that trade "names should be carefully analyzed and dissected by the consuming public."[51] Nor is it required that the consumer know the personal identity of the manufacturer of the article; it is sufficient if the impression which the infringing product makes upon the consumer is such that he is likely to believe the product is from the same source as the one he knows under the trade-mark.[52]

Stix, acknowledging the validity of United's mark, nonetheless presses that it has never used the word "contact" in the hyphenated form or simulated the CON-TACT fanciful script, and argues that consumers could not mistake its use of the word for a trade-mark use. This suggests that the consumer would be misled only by a Chinese copy of United's mark. It overlooks the average consumer, who at times is "hasty, heedless and easily deceived."[53] It is unrealistic to suppose that consumers, aware of United's trade-mark, constantly have in mind the precise form in which it is registered and used by its owner. Only the most sophisticated, attentive and careful observer would, on the cursory inspection characteristic of one browsing in a store or scanning a newspaper advertisement, perceive that the word "contact" was not in its usual trade-mark form CON-TACT.

Entirely apart from the visual aspect, the trade-mark CON-TACT and the word "contact" sound identical in ordinary pronunciation. Those whose awareness of the trade-mark stems from conversations with others cannot know that "contact" is not in fact the trade-mark. The law of trade-marks is not so unsophisticated as to permit an infringer to escape liability by subtle variations of form. For Stix to ackowledge the validity of United's trade-mark CON-TACT and at the same time to use "contact" in the manner it has in competition with United's CON-TACT suggests keeping the word of promise to the ear and breaking it to the hope.

Shulman himself was not unaware of the danger of confusion flowing from Stix's use of the word "contact" in its advertising and promotional activities. He repeatedly cautioned his sales personnel to be "very careful" and "to be absolutely certain that our use of the word 'contact' does not result in any confusion, or substitution of one product for another." Whether or not this admonition was sincere or was part of his campaign hereafter referred to is another matter.

A graphic illustration of actual confusion is the fact, conceded by Shulman, that Stix mistakenly paid allowances on retailers' advertisements for United's product. There is impressive evidence of actual confusion and even of palming off. Two witnesses, executives of Unit-

50. LaTouraine Coffee Co. v. Lorraine Coffee Co., 157 F.2d 115, 117 (2d Cir.), cert. denied, 329 U.S. 771, 67 S.Ct. 189, 91 L. Ed. 663 (1946) ; cf. Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F. 2d 755, 762 & n. 19 (2d Cir. 1960); Allen v. Walker & Gibson, 235 F. 230, 237 (N.D.N.Y.1916).

51. Van Camp Sea Food Co. v. Packman Bros., 4 F.Supp. 522, 524 (D.N.J.1933),

aff'd on opinion below, 79 F.2d 511 (3d Cir. 1935).

52. Feathercombs, Inc. v. Solo Prods. Corp., 306 F.2d 251, 255 (2d Cir.), cert. denied, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962) ; Tas-T-Nut Co. v. Variety Nut & Date Co., 245 F.2d 3, 7 (6th Cir. 1957).

53. New York Mackintosh Co. v. Flam, 198 F. 571, 572 (S.D.N.Y.1912).

ed, whose testimony the Court finds credible, testified to such incidents in retail stores. Customers who asked for CON-TACT were sold Stix and Adorn products by sales personnel who, to justify their acts, referred to the word "contact" on the Stix and Adorn backing sheets and told the customers the product was the same as CON-TACT. These were not isolated instances but occurred on many occasions. Letters in evidence received by both United and Stix indicate consumer confusion arising out of Stix's use of "contact."

Stix's use of "contact" is not limited to its own immediate advertising and promotional campaigns; it extends to advertising mats and other materials that it prepares and distributes to thousands of retailers throughout the country. In the ad mats "contact" usually appears at the beginning or the end of a line, and at times on a line by itself. The retailers have responded to the bait. Using material from Stix's mats, they have infringed on United's mark in newspaper and point of sale advertising. They have accorded prominence to and emphasized the word "contact." Of a substantial number of retailers' advertisements received in evidence, almost sixty per cent displayed "contact" larger than any other word, or at least as large as any other word.[54]

The retailers have devised all manner and variations of the use of the word "contact" in a trade-mark sense. Many cut the word "contact" from the mats supplied by Stix and gave it prominence in their advertisements. There are instances where the Stix and Adorn trademarks do not appear at all and even where the word "contact" is hyphenated. Retailers' advertisements include, among others: "Con-Tact Paper"; "Contact Paper"; "CONTACT SHELF PAPER"; and "STIX-ON CONTACT."[55] Likelihood of confusion is beyond question. Actual confusion has been shown. Shulman himself, confronted with a number of these ads, had to admit that he was confused whether the retailer was advertising Stix's or United's product. If the expert is confused, the consumer is easy prey to deception.[56]

The instances of egregious retailer infringement of United's mark by the use of Stix's previously prepared mats were so numerous that Stix asserted it attempted to police such conduct, but that the retailers' conduct was beyond its control.[57] Thus, it seeks to disclaim responsibility for the retailers' violations and urges that United's "recourse is only against the customers in question * * *." But the distribution of the mats and other promotional advertising material was part of Stix's campaign to sterilize United's mark.

---

54. Shulman conceded that where "contact" was the largest word in the advertisement a question arose whether the advertiser "wanted to trade on the competitor's trademark * * *."

55. Other examples are:

ADORN
Self Adhesive
CONTAC PAPER

REG. $1.98 ADORN
CONTACT
SHELF PAPER

4-Yard
Length
Adorn Adhesive
PLASTIC
"CONTAC PAPER"

56. "Confusion among clerks is in itself enough to establish infringement because 'it is certain that if clerks who sell a product are confused to the point of selling one article for another such is evidence of the probability of confusion by customers.'" Telechron, Inc. v. Telicon Corp., 97 F.Supp. 131, 143 (D.Del.1951), aff'd, 198 F.2d 903 (3d Cir. 1952).

57. Shulman, challenged to produce a single letter sent by Stix to any of its retailers admonishing against trade-mark use of the mats, retorted to United's counsel, "I believe it is your job to police your mark, not mine."

And entirely apart from this calculated purpose, it was foreseeable that retailers would use the material in an infringing manner, as so many did.[58] Stix supplied the ammunition to the retailers; the retailers fired the shots. Stix was a knowing accomplice in the wrongful conduct.[59] Instead of "keep[ing] far enough away to avoid all possible confusion,"[60] Stix deliberately fostered the confusion through its retailers; it enabled them to substitute and palm off Stix's products as United's. Its conduct must also be viewed in the light of its payment of fifty per cent of retailers' advertising costs[61] and its "hold harmless" agreements with some customers relating to their use of the word "contact."

Stix itself engaged in flagrant infringement in the twice-yearly sales of its discontinued patterns at reduced prices. These were advertised as "Famous Brand" sales. Originally, the advertisement read, "FAMOUS BRAND SELF-ADHESIVE DECORATING PLASTIC." Then in March, 1960, the word "contact" was injected into the captions so that they read, "FAMOUS BRAND SELF-ADHESIVE CONTACT DECORATING PLASTIC." Stix's policy is that its trade-mark STIX not appear either in the captions of newspaper advertising or on the rack headers displaying the goods in the stores. The result, in both instances, is a prominent display of CONTACT in close association with the phrase FAMOUS BRAND and without any reference to STIX. Since CONTACT is by far the frontrunner in the field, the clear implication is that it is United's CON-TACT brand that is being offered for sale.

■ With respect to its other uses of "contact," Stix seeks to excuse its conduct on the ground that its trade-marks are displayed in proximity to the captions wherein the word appears; accordingly, it argues that the consumer is necessarily aware its brands and not United's CON-TACT are offered. It contends that "[i]f there is any ambiguity as to source from the word 'contact' alone, it is dispelled by coupling it with these specific indications of origin." Stix's position, of course, cannot justify the Famous Brand sales technique, which, under Stix's policy, omits any display of its trade-mark; the sole indication of source is the word "contact." In the other instances the display of Stix's mark in proximity to the word "contact" in the captions aggravates rather than mitigates the wrongful conduct, since it serves to mislead.[62] The association,

58. Cf. Reid, Murdoch & Co. v. H. P. Coffee Co., 48 F.2d 817, 819–820 (8th Cir.), cert. denied, 284 U.S. 621, 52 S.Ct. 9, 76 L.Ed. 529 (1931); N. K. Fairbank Co. v. Luckel, King & Cake Soap Co., 102 F. 327, 330 (9th Cir. 1900); John H. Woodbury, Inc. v. William A. Woodbury Corp., 23 F.Supp. 162, 168 (S.D.N.Y.1938).

59. Cf. John B. Stetson Co. v. Stephen L. Stetson Co., 85 F.2d 586, 588 (2d Cir.), cert. denied, 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446 (1936); Andrew Jergens Co. v. Bonded Prods. Corp., 21 F.2d 419, 424 (2d Cir. 1927), cert. denied, 275 U.S. 572, 48 S.Ct. 204, 72 L.Ed. 432 (1928); N. K. Fairbank Co. v. R. W. Bell Mfg. Co., 77 F. 869, 878 (2d Cir. 1896); Cuervo v. Jacob Henkell Co., 50 F. 471, 472 (C.C. S.D.N.Y.1892); Data Digests, Inc. v. Standard & Poor's Corp., 43 F.R.D. 386, 389 (S.D.N.Y.1967); 2 H. Nims, The Law of Unfair Competition and Trade-Marks, § 284, at 941 (4th ed. 1947).

60. Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F.2d 755, 758 (2d Cir. 1960); G. D. Searle & Co. v. Chas. Pfizer & Co., 265 F.2d 385, 387 (7th Cir.), cert. denied, 361 U.S. 819, 80 S.Ct. 64, 4 L. Ed.2d 65 (1959); Northam Warren Corp. v. Universal Cosmetic Co., 18 F.2d 774, 775 (7th Cir. 1927); Atlantic Monthly Co. v. Frederick Ungar Publishing Co., 197 F.Supp. 524, 532 (S.D.N.Y.1961).

61. Not to exceed five per cent of purchases.

62. Jacobs v. Beecham, 221 U.S. 263, 272, 31 S.Ct. 555, 55 L.Ed. 729 (1911); Menendez v. Holt, 128 U.S. 514, 521, 9 S.Ct. 143, 32 L.Ed. 526 (1888); Le Blume Import Co. v. Coty, 293 F. 344, 359 (2d Cir. 1923); Nashville Syrup Co. v. Coca Cola Co., 215 F. 527, 530 (6th Cir. 1914); Atlantic Monthly Co. v. Frederick Ungar Publishing Co., 197 F.Supp. 524 (S.D. N.Y.1961).

physically and optically, of the Stix mark with "contact" tends to create "a very advantageous uncertainty" as to Stix's relationship with United.[63] It suggests that the Stix product is somehow related to the CON-TACT brand product or that Stix and United are engaged in joint activity.[64] Consumer awareness of CON-TACT as the outstanding brand for the products, coupled with relative unawareness of the Stix brand, as borne out by the surveys, makes it unlikely that the consumer will recognize the Stix trade-marks to the extent of negating the recognition of the far better known CON-TACT brand. In the circumstances, Stix's use of its own marks does not exonerate it from liability.

Relevant on the issue of likelihood of confusion is whether the use of "contact" was innocent or purposeful. Bad faith is itself strong evidence on the issue.[65] It is also relevant on the claim of unfair competition.[66] The law places upon the latecomer a duty to avoid confusion or mistake.[67] Stix, for the first five years following its entry into the self-adhesive decorative plastic field, observed this duty. It never used the word "contact" in any way. When, in late 1959 or early 1960, it commenced to use it in its advertising and promotional captions, it knew that United had successfully exploited its mark CON-TACT; it knew also that CON-TACT was the dominant brand, a Famous Brand to the majority of consumers and the national leader in sales volume. Despite its duty "to keep far enough away to avoid all possible confusion," [68] Stix deliberately embarked upon a campaign to sterilize, if not to destroy, United's mark. Its efforts also encompassed a built-in defense conceived in anticipation of the charges now levelled against it.[69]

Shulman's explanation that "contact" was included in the captions more accurately to describe the product or to clarify the descriptions previously used and, as he also asserted, because the term had become generic, finds ready rejection in the record. The addition of "contact" in the captions was not "a reasonably necessary word to describe the product to the public." [70] Not only had Stix itself never used the term for the first five years, but even to this day a substantial portion of its retailers conduct their merchandising without resort to the word "contact." Its New England distributor does not use the term. None of the other competitors in the industry has ever used it. Sears, Roebuck & Co. and Spiegel & Co., two of Stix's largest

63. John B. Stetson Co. v. Stephen L. Stetson Co., 85 F.2d 586, 588 (2d Cir.), cert. denied, 299 U.S. 605, 57 S.Ct. 232, 81 L. Ed. 446 (1936).

64. In one instance, United has licensed another company to use its trade-mark.

65. G. B. Kent & Sons, Ltd. v. P. Lorillard Co., 114 F.Supp. 621, 626 (S.D.N.Y. 1953), aff'd on opinion below, 210 F.2d 953 (2d Cir. 1954); Best & Co. v. Miller, 167 F.2d 374, 377 (2d Cir.), cert. denied, 335 U.S. 818, 69 S.Ct. 39, 93 L.Ed. 373 (1948); L. E. Waterman Co. v. Gordon, 72 F.2d 272, 273 (2d Cir. 1934).

66. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 325, 59 S.Ct. 191, 83 L.Ed. 195 (1938).

67. Feathercombs, Inc. v. Solo Prods. Corp., 306 F.2d 251, 258 (2d Cir.), cert. denied, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962); Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F.2d 755, 758 (2d Cir. 1960); Florence Mfg. Co. v.

J. C. Dowd & Co., 178 F. 73, 75 (2d Cir. 1910); Atlantic Monthly Co. v. Frederick Ungar Publishing Co., 197 F.Supp. 524, 532 (S.D.N.Y.1961); National Biscuit Co. v. Baker, 95 F. 135, 135–136 (C. C.S.D.N.Y.1899).

68. Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F.2d 755, 758 (2d Cir. 1960); G. D. Searle & Co. v. Chas. Pfizer & Co., 265 F.2d 385, 387 (7th Cir.), cert. denied, 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed. 2d 65 (1959); Northam Warren Corp. v. Universal Cosmetic Co., 18 F.2d 774, 775 (7th Cir. 1927); Atlantic Monthly Co. v. Frederick Ungar Publishing Co., 197 F. Supp. 524, 532 (S.D.N.Y.1961).

69. Cf. Atlantic Monthly Co. v. Frederick Ungar Publishing Co., 197 F.Supp. 524, 531 (S.D.N.Y.1961).

70. Q-Tips, Inc. v. Johnson & Johnson, 206 F.2d 144, 147 (3d Cir.), cert. denied, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953).

customers, do not use it. Analysis of representative samples of 17,000 retailer advertisements from 1962 to 1967 reveals that ninety per cent of the advertisements (excluding those for Stix and United's brands) and more than one-third of Stix and Adorn advertisements did not use the word "contact" to describe the product.

▋ The Stix captions prior to 1960 were apt descriptive phrases. In the late 1950's the caption "SELF-ADHESIVE DECORATING PLASTIC" had become standard. That the addition of the word "contact" was unnecessary is further evident from the fact that it is redundant and serves only to echo United's trademark CON-TACT.[71] Shulman himself acknowledged it was "terribly redundant." The evidence indicates that fifty or sixty descriptive terms which did not include "contact" were available to Stix if it required further description in its captions. The evidence compels the finding that Stix's decision to use the word "contact" was not dictated by necessity, but was born of a conscious and deliberate purpose to trade on United's good will.

Shulman's awareness that Stix's use of "contact" posed a threat to United's trade-mark rights is underscored by the circumstances that Firestone representatives suggested that he "might want to avoid it like the very plague." Stix's true motive, as well as its unfair competitive conduct, are also revealed in the particularly reprehensible "Famous Brand" sales technique described above. The inescapable conclusion is that Stix has been conducting a semi-annual campaign to trade on United's good will.

Still further evidence of Stix's lack of good faith is Shulman's campaign, starting in 1960, after Stix commenced to use "contact" in its captions, to convince the trade and the public that the word "contact" was a generic term and descriptive of the goods. At least twice a year since 1960 Shulman has made speeches at sales conventions and gatherings of salesmen, manufacturers' representatives, jobbers and distributors, at which he urged that all self-adhesive decorative plastics should be described as "contact" material, and that the term was in fact generic for the products. Shulman also distributed memoranda urging dealers and representatives to use "contact" as a generic term. If, as Shulman contends, he had come to the conclusion by 1959, based upon what those in the market place had told him, that the "sophisticated buyer * * * and the unsophisticated consumer" were "indeed calling [the product] * * * by this peculiar term," one is moved to question why after 1960 he found it necessary to educate the very sources of his information.

▋ The Court is persuaded that Shulman's activities were a deliberate attempt to impart legitimacy to Stix's claim of genericness. Stix's adoption of the word "contact," fully aware of United's mark and recognizing that such use might infringe on United's rights, coupled with its calculated campaign to undermine United's mark and to impart plausibility to a defense, evince a "consciousness of purpose to engage in unfair activity." [72]

▋ Upon the entire record, United has established that Stix's use of "contact," as enumerated above, is an infringement of United's trade-mark CON-TACT; that such use is likely to confuse and in fact has confused the purchasing public that the Stix products offered for sale are the CON-TACT brand; and that Stix, as enumerated above, has engaged in acts of unfair competition.

---

71. As Dr. Evans testified, "You cannot have adhesion without * * * contact."

72. Atlantic Monthly Co. v. Frederick Ungar Publishing Co., 197 F.Supp. 524, 532 (S.D.N.Y.1961); Miles Shoes, Inc. v. R. H. Macy & Co., 199 F.2d 602, 603 (2d Cir. 1952), cert. denied, 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953).

Stix's infringement of United's trademark CON-TACT was intentional and purposeful. That Shulman persuaded himself he had a legal right to pursue the course he did diminishes neither the fact of Stix's violation of United's rights, nor the force of its impact upon the consumer. That a course is stubbornly pursued does not render it innocent. The very persistence in the infringing conduct over the prompt protest of United not only emphasizes its wilfulness, but continues the wrong, entitling United to judicial redress.[73]

 United is entitled to an appropriate decree enjoining Stix's use of "contact" in the captions of its advertising and promotional material, whatever its form. The decree shall also extend to Stix's use of the word in what the parties have referred to as a "linguistic" use, as distinguished from the caption use discussed above. An example of such "linguistic" use appears on the backing sheet of the Adorn brand, where, since 1963, the word "contact" has appeared twice in a complete declarative sentence: "ADORN is a self-adhesive contact decorating plastic that will adhere on contact without paste, water or glue to any smooth, clean, dry, non-porous surface." Its repetitive use in this instance, while arguably descriptive, is as unnecessary as it is redundant. If the twice-used word "contact" is omitted entirely, the quoted sentence is aptly descriptive. The presence of the word in the sentence is so obviously forced that by itself it is revealing. Stix's use of the word in the "linguistic" context must be considered in the setting of its entire conduct—its continuing and deliberate effort to trade on the commercial value of United's mark. Moreover, the Adorn backing sheet itself features the word "contact" in its caption; at point of sales it is displayed in proximity to the rack header with its offending caption. The appearance of the word in the linguistic material serves only to echo and reinforce the caption usage.

 This Court's responsibility is "to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent Office." [74] Under the circumstances of this case, an all-inclusive injunction is required to prevent such violation of United's rights. In the light of Stix's purposeful conduct, United is also entitled to an accounting of profits and damages.[75] However, United's request for counsel fees must be denied under both federal trade-mark law [76] and the New York State law of unfair competition.[77]

### THE CLAIM AGAINST FIRESTONE

 United also charges The Firestone Tire & Rubber Co. with contributory infringement. Firestone, in defense, asserts that it merely assembled the plastic product on order from Stix. However, it is settled law that one who knowingly participates in the manufacture of goods that infringe upon the trade-mark rights of another is liable

---

73. Menendez v. Holt, 128 U.S. 514, 523, 9 S.Ct. 143, 32 L.Ed. 526 (1888); G. H. Mumm Champagne v. Eastern Wine Corp., 142 F.2d 499, 502 (2d Cir.), cert. denied, 323 U.S. 715, 65 S.Ct. 41, 89 L. Ed. 575 (1944).

74. 15 U.S.C. § 1116.

75. Monsanto Chemical Co. v. Perfect Fit Prods. Mfg. Co., 349 F.2d 389 (2d Cir. 1965), cert. denied, 383 U.S. 942, 86 S. Ct. 1195, 1198, 16 L.Ed.2d 206 (1966).

76. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967).

77. Miss Susan, Inc. v. Enterprise & Century Undergarment Co., 270 App.Div. 747, 750, 62 N.Y.S.2d 250, 253 (1st Dept. 1946), aff'd per curiam, 297 N.Y. 512, 74 N.E.2d 461 (1947); Winthrop Chemical Co. v. Blackman, 159 Misc. 451, 452–453, 288 N.Y.S. 389, 390–391 (Sup.Ct. 1936).

**500**

as a contributory infringer.[78] United is entitled to protection against all who knowingly play a significant role in accomplishing the unlawful purpose.[79]

The evidence abundantly establishes that Firestone was no innocent, inadvertent or casual processor of the product bearing the infringing term "contact." Stix was launched upon its career with the affirmative aid of Firestone. Ever since Stix's entry into the self-adhesive decorative plastic field, Firestone has played an active and essential role in Stix's affairs with respect to the products in question, providing Stix with extensive financial and technical assistance. From 1955 to 1964 Firestone supplied Stix with the plastic film for the product; from 1964 to the present it has supplied all but the backing sheets and has assembled the completed product for Stix.

From the beginning Firestone knew of United's trade-mark and, with the passage of time, that it was the dominant brand; at an early period it counselled Shulman to make the product "exactly parallel" to United's. When, in 1959, Stix contemplated the use of "contact" in its captions and other advertising material, Firestone's officials were consulted and acquiesced in Shulman's decision. Firestone's counsel provided the legal advice which guided Stix. Stix, in turn, kept Firestone informed of its advertising and promotional policies, "in terms of displays, advertising copy and format, the nature of a campaign * * *."

Not only did Firestone process the product which contained the infringing term, it also actively aided, abetted and furthered Stix's entire advertising and promotional campaign in the use of "contact" and its invasion of United's trade-mark rights. That Firestone's executives were fully aware of the trade-mark implications of Stix's use of "contact" is evident both from the fact that when Shulman first proposed the idea, one of them suggested, "You might want to avoid it like the very plague," and from the further circumstance that at a subsequent time the same executive asked Shulman point-blank, "[A]re you going to ride on their [United's] coat-tails or are you going to try to make out this is CONTACT brand?" Other evidence abundantly establishes Firestone's knowing participation in Stix's wrongful actions. A clear case of contributory infringement is made out against Firestone, and the decree shall extend to it.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Either party, within ten (10) days and upon five (5) days' notice to the other, may propose, consistent with the foregoing, additional Findings of Fact and Conclusions of Law.

78. John B. Stetson Co. v. Stephen L. Stetson Co., 85 F.2d 586, 588 (2d Cir.), cert. denied, 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446 (1936) ; Reid, Murdoch & Co. v. H. P. Coffee Co., 48 F.2d 817, 819–820 (8th Cir.), cert. denied, 284 U.S. 621, 52 S.Ct. 9, 76 L.Ed. 529 (1931) ; Andrew Jergens Co. v. Bonded Prods. Corp., 21 F.2d 419, 424 (2d Cir. 1927), cert. denied, 275 U.S. 572, 48 S.Ct. 204, 72 L.Ed. 432 (1928) ; N. K. Fairbank Co. v. R. W. Bell Mfg. Co., 77 F. 869, 878 (2d Cir. 1896) ; Coca-Cola Co. v. Snow Crest Beverages, 64 F.Supp. 980, 989 (D.Mass.1946), aff'd, 162 F.2d 280 (1st Cir.), cert. denied, 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386 (1947). Cf. Data Digests, Inc. v. Standard & Poor's Corp., 43 F.R.D. 386, 389 (S.D.N.Y.1967) ; Stanley Works v. Haeger Potteries, Inc., 35 F.R.D. 551, 553–554 (N.D.Ill.1964) ; American Infra-Red Radiant Co. v. Lambert Industries, Inc., 32 F.R.D. 372, 374–375 (D.Minn.1963) ; Flying Tiger Line v. Atchison, T. & S. F. Ry., 75 F.Supp. 188, 190 (S.D.Cal. 1947).

79. Cuervo v. Jacob Henkell Co., 50 F. 471, 472 (C.C.S.D.N.Y.1892) ; 2 H. Nims, The Law of Unfair Competition and Trade-Marks, § 284, at 941 (4th ed. 1947).